## STATE v. JOEY ALAN DAKOTA.

217 N. W. 2d 748.

April 26, 1974—No. 44159.

*C. Paul Jones,* State Public Defender, and *Robert E. Oliphant* and *Barbara Britt,* Assistant State Public Defenders, for appellant.

*Warren Spannaus,* Attorney General, *Gary W. Flakne,* County Attorney, and *Theodore R. Rix, Michael McGlennen,* and *Vernon E. Bergstrom,* Assistant County Attorneys, for respondent.

Heard before Knutson, C. J., and Peterson, Todd, and Yetka, JJ., and considered and decided by the court.

PETERSON, JUSTICE.

Defendant, Joey Alan Dakota, was convicted in Hennepin County District Court of the crime of aggravated assault in violation of Minn. St. 609.225(1). Appealing from the judgment, he contends: (1) that the trial court erred in not ruling that certain statements made by him before he had been given Miranda warnings tainted and rendered inadmissible other statements made after he had waived his Miranda rights, and (2) that there

was prejudicial error in the instructions on self-defense. We affirm.

The assault of which defendant was convicted took place in the basement of a South Minneapolis apartment building in the early morning of March 8, 1972. On the evening of March 7, 1972, defendant and his girl friend, Kathy, attended a party at the apartment of Beverly Graves in that building. Sometime during the party, defendant became aware of his girl friend's absence, left the apartment to look for her and, in the course of his search, wandered into the basement of the building. Unbeknown to defendant, Henning Youngquist, age 82, another tenant of the building, was temporarily using the basement as a bedroom. Defendant was convicted of assaulting Youngquist at that time and place.

According to William Quinn, a police lieutenant who questioned defendant on the following day, defendant explained his actions as follows:

"* * * He said he entered the room where the incident later occurred and he was shouting for Kathy. And all of a sudden the old man got out of bed and came at him with a chair in his hands. He said he took the chair away from the old man and threw it at him. I asked him if he recalled actually striking the man with the chair or swinging it at him. He said he did not swing it at him or attempt to strike him with it, but rather threw it at him and indicated with a motion, indicating that he had pushed it and thrown it away from him towards the man. He said that when the chair hit the man, the old man fell down and he looked at him and realized that he was hurt. He recalls something about kneeling down or doing something, talking to the man, and the old man saying, 'Leave me alone,' when he tried to help him."

Fearful that he had killed Youngquist, defendant returned to the Graves' apartment for help, related to Mrs. Graves what had happened, and went downstairs again with her. After defendant came back to the apartment, one of the other guests, having

learned of what had happened, became upset, hit defendant, and pulled him outside. Outside they found several police cars which had initially arrived on the scene in response to another disturbance. The police, who had already received some information regarding a possible assault, separated defendant and his captor.

One of the officers on the scene, Thomas Cloutier, then requested Thomas Billings, who had arrived later, to take custody of Dakota. Billings was informed by Cloutier that an assault had been reported and that from the reports of the others, Dakota was probably the assailant. Billings placed Dakota in the back of his squad car and then asked him what happened. At the Rasmussen hearing, Billings testified to this conversation as follows:

"Q. Did you have any conversation with Dakota at that time?

"A. Yes, sir, I asked him what happened.

"Q. What did he say?

"A. He stated that he was at a party with another girl, and she had run out of the apartment and into the basement, toward the rear of the apartment. He stated he followed her and somehow lost her in the rear of the apartment, and that he entered the basement. He said at this time a man came at him with a chair in his hands, and he stated he knocked him down and took the chair away from him and struck the man in the face.

"Q. During this conversation did you advise him of anything?

"A. Yes, sir, I advised him of his rights, after—or just before he stated that he struck the man.

"Q. What did you advise him? Tell the Court exactly what you told Dakota.

"A. I advised him of his rights per Miranda; I read the Miranda card to him.

"Q. Do you have that card with you that you read to him?

"A. Yes, sir.

"Q. Would you read it for the record.

"A. 'The Constitution requires I inform you that you have

the right to remain silent. Anything you say will be used in court as evidence against you. You are entitled to talk to a lawyer now and have him present now or at any time during questioning. If you cannot afford a lawyer, one will be appointed for you without cost.' And I asked him if he understood his rights and he stated, 'Yes.' I asked him if he wished to talk to me at this time, and he stated, 'Yes.'

"Q. What conversation did you have with him subsequent to advising him?

"A. I asked him again what happened, and he repeated the first part of it, and replied that—

"Q. —Well, you will have to go through the whole thing, what he told you after he was advised.

"A. He stated that he followed a girl to the rear of the apartment and lost her, and was unable to leave the apartment building. He went into the basement to look for her. He stated a man came at him, as he entered the basement, with a chair in his hand. And he stated that he knocked the man down and picked up the chair and struck the man in the face with the chair."

At the conclusion of the Rasmussen hearing, the court ruled that defendant's statements to Officer Billings prior to the Miranda warnings would be suppressed, but the court declined to suppress either defendant's statements to Billings following the warnings or defendant's statements made on the next day to Lieutenant Quinn after additional warnings and waiver. Both Billings and Quinn testified at the trial, while defendant did not. Billings' testimony differed somewhat from Quinn's in that Billings testified that defendant said he knocked Youngquist down, took the chair from him, and knocked him in the face. Defendant's objection to Billings' testimony regarding the statements made by defendant subsequent to receiving a Miranda warning was renewed and again denied at trial.

■ Defendant's basic argument is that his post-Miranda state-

ments to Officer Billings [1] should not have been admitted because he was not informed that the statements he made before the Miranda warnings could not be used against him. He relies upon the "fruit of the poisonous tree" test stated in Wong Sun v. United States, 371 U. S. 471, 83 S. Ct. 407, 9 L. ed. 2d 441 (1963).

The Wong Sun test is phrased as "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." 371 U. S. 488, 83 S. Ct. 417, 9 L. ed. 2d 455. Thus the first issue to be resolved is whether the initial inculpatory statements were illegally obtained.

Under Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. ed. 2d 694, 10 A. L. R. 3d 974 (1966), the warnings required by the privilege against self-incrimination must be given in circumstances of custodial interrogation—"Questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U. S. 444, 86 S. Ct. 1612, 16 L. ed. 2d 706, 10 A. L. R. 3d 993. In excluding testimony regarding defendant's prewarning statements, the trial court implicitly held, contrary to the state's contention, that these statements were made in the context of custodial interrogation undertaken before appropriate warnings and waiver.

It is true that neither Miranda itself nor subsequent decisions of this court require warnings in the course of preliminary, non-custodial investigations or general questioning of citizens in the factfinding process. See, e. g., State v. Martin, 297 Minn. 470, 212 N. W. 2d 847 (1973); State v. Hoskins, 292 Minn. 111, 193 N. W. 2d 802 (1972); State v. Kinn, 288 Minn. 31, 178 N. W. 2d 888 (1970). However, something more than a general investiga-

---

[1] Defendant does not now strenuously dispute the admissibility of Lieutenant Quinn's testimony regarding defendant's statements on the day after his arrest and apparently views Quinn's testimony as more favorable to his claim of self-defense.

tion was involved in the present case. Defendant had been placed in the custody of Officer Billings by Officer Cloutier; the officers already believed that he had probably committed an assault. Officer Billings placed defendant, who was certainly not free to go, in a squad car and then began to question him before giving him the Miranda warnings. Thus the atmosphere was one of custodial interrogation, with suspicion already focused on defendant. The state's further arguments that defendant was aware of his rights and that his statements were not inculpatory are irrelevant and without merit under Miranda.

Granted that the first statement was illegally obtained, the second and more crucial issue is whether, under a derivative evidence rule, the statements made by defendant after the warnings and waiver were the inadmissible results of the prior illegality. While a number of cases in other jurisdictions have applied a "fruit of the poisonous tree" rationale to a second confession made after an inadmissible first confession followed by Miranda warnings, none goes so far as to hold that the failure to warn a defendant of the inadmissibility of the prewarning statements renders the later statements per se inadmissible. See, e. g., Evans v. United States, 375 F. 2d 355 (8 Cir. 1967); Fisher v. Scafati, 439 F. 2d 307 (1 Cir.), certiorari denied, 403 U. S. 939, 91 S. Ct. 2256, 29 L. ed. 2d 719 (1971); State v. Lekas, 201 Kan. 579, 442 P. 2d 11 (1968); Commonwealth v. Banks, 429 Pa. 53, 239 A. 2d 416 (1968). Rather, the question seems to be one of the facts of the individual case.

The rationale for the point of view advocated by defendant was articulated by the United States Supreme Court in a pre-Miranda case, United States v. Bayer, 331 U. S. 532, 540, 67 S. Ct. 1394, 1398, 91 L. ed. 1654, 1660 (1947):

"* * * [A]fter an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The

secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first."

However, the court promptly rejected that rationale, saying:

"* * * But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed." Id.

The court has not taken a different view in subsequent cases.

The two other cases relied on by defendant likewise do not compel a holding that the statements in question here should have been excluded. In Leyra v. Denno, 347 U. S. 556, 74 S. Ct. 716, 98 L. ed. 948 (1954), a confession was extorted from a defendant, after many hours of questioning, by a psychiatrist who had been presented to the defendant as a sinus specialist. The confession was overheard by law-enforcement officials in the next room and then immediately repeated to them. In Westover v. United States, 384 U. S. 436, 494, 86 S. Ct. 1602, 1638, 16 L. ed. 2d 694, 735, 10 A. L. R. 3d 974, 1023 (1966), a companion case to Miranda, a confession to the FBI, after warnings, immediately followed a lengthy warningless interrogation by local police. In holding the confession inadmissible, the court relied on the fact that an intelligent waiver had not been shown. Thus the facts in both these cases are very different from those of the present case.

We have never adopted a presumption of illegality in cases where a challenged confession followed earlier, warningless inculpatory or exculpatory statements, but have instead evaluated each case on its own facts. In State ex rel. Pittman v. Tahash, 284 Minn. 365, 170 N. W. 2d 445 (1969), the first confession was made in the absence of warnings to a prison superintendent, and the second was made after appropriate warnings, several hours later, to a sheriff. Although holding that Miranda warnings should have been given initially, we nevertheless held that there was evidence to sustain a finding of lack of taint in the second confession. In State v. Hoskins, 292 Minn. 111, 193 N. W. 2d 802

(1972), the hospitalized defendant first made oral exculpatory statements, later made a further exculpatory statement, and then, after warnings and further questioning, gave complete written confessions. We held that the first statement was not the result of custodial interrogation but that, by the time of the second, the investigation had sufficiently focused on defendant to require warnings. We nevertheless held that the warnings and waiver dispelled any taint of the confessions (292 Minn. 132, 193 N. W. 2d 816) :

"As to defendant's allegation that the inadmissible exculpatory statement prejudicially tainted the subsequent written confessions, we find no basis for this claim in the record. Before giving both written confessions, defendant was clearly and properly informed of his rights under Miranda v. Arizona, *supra.* He gave no information prior to these warnings which would cast suspicion upon him nor add to his exculpatory statements. It is clear that outside investigation, and not his own admissions, was the factor which led the authorities to warn him of his rights and to conduct the subsequent interrogations which elicited his confessions.

"In State ex rel. Pittman v. Tahash, 284 Minn. 365, 170 N. W. 2d 445 (1969), this court held that a full oral confession, inadmissible because obtained without proper warnings, did not prejudicially taint a written confession obtained later in the day after proper warnings were given. Here we have much less, because at no time up until he was warned, was interrogated, and subsequently confessed, did defendant implicate himself in the commission of the crimes."

Although in the present case defendant did implicate himself to some extent by his prewarning statements, we find, as in Pittman and Hoskins, that there was sufficient support for the trial court's admission of defendant's postwarning statements. It appears from defendant's behavior before the police took custody of him that he desired to make known to the several persons he encountered what he had done. He had done some drinking, but

the evidence establishes that he was generally coherent. Since only one question—a general question as to "what happened"—was asked of defendant before the warnings, it would be most unrealistic to picture his will as so overcome by questioning that the subsequent warnings made no impact. Nothing in the circumstances of this case requires exclusion of any of defendant's post-warning statements to either Officer Billings or Lieutenant Quinn as tainted products of the prior illegality.

■ Defendant argues, as a second ground for reversal of his conviction, that the trial court's instruction on self-defense was erroneous. The court instructed the jury in pertinent part as follows:

"* * * It is the general rule that the legal excuse of self-defense is available only to those who act honestly and in good faith. The rule requires, one, the absence of aggression or provocation on the part of the Defendant; two, the actual and honest belief of the Defendant that he was in imminent danger of death, great bodily harm or some felony, and it was necessary to take the action he did; three, the existence of reasonable grounds for such belief, and four the duty of the Defendant to retreat or avoid the danger if reasonably possible."

Defendant objected to the instruction only at the time the jury asked for a rereading of it.

Even if defendant's objection to the instruction was timely, we find little merit to his contention. The rule stated in the instruction in question was explicitly approved in State v. Johnson, 277 Minn. 368, 152 N. W. 2d 529 (1967), a homicide case, and again approved in State v. Baker, 280 Minn. 518, 160 N. W. 2d 240 (1968), a case involving assault. Defendant's argument that there should be no reference to "felony" in an assault case, as opposed to a homicide case, therefore makes a distinction without great significance. Even if defendant's comparison of Minn. St. 609.06(3) (authorized use of force) and Minn. St. 609.065(1) (justifiable taking of life) suggests that the self-defense instruction might be somewhat more carefully phrased

in the case of assault to reflect the authorization in the former statute to use reasonable force "to resist an offense against the person," any error was at most harmless. The word "felony" comprehends many offenses against the person and was in any event used in the disjunctive.

Affirmed.

MR. CHIEF JUSTICE SHERAN, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

MR. JUSTICE SCOTT took no part in the consideration or decision of this case.