STATE v. STEVEN THOMAS RAYMOND.

232 N. W. 2d 879.

August 22, 1975—No. 45224.

*Warren Spannaus*, Attorney General, and *John A. Winters*, County Attorney, for appellant.

*C. Paul Jones*, Public Defender, and *Mark W. Peterson*, Assistant Public Defender, for respondent.

Heard before Rogosheske, Kelly, and Yetka, JJ., and considered and decided by the court en banc.

KELLY, JUSTICE.

This case presents an appeal by the state[1] from an order of the Polk County District Court suppressing certain evidence prior to trial. We affirm in part and reverse in part.

---

[1] Minn. St. 632.11, subd. 1(3).

On December 27, 1973, the defendant was called at home and invited down to the police station to answer some questions in regard to a homicide investigation. Bruce Slager, a friend of the defendant, had shot and killed his mother on December 22, 1973. There was reason to believe that Slager may have been under the influence of a controlled substance at the time. The police had previously questioned a Brad Teubner, another friend of Slager, about any involvement in supplying drugs to Slager, with negative results. During the questioning, prior to which defendant was not given any Miranda warnings, defendant was asked by the chief of police about his conversations with Slager on the day of the shooting and whether he knew Brad Teubner. He also was asked questions about arguments between Slager and his mother, about arguments Slager might have had with other members of the Slager family, and about guns and hunting.

The key questions and answers that revealed defendant's involvement in the use of, and sale to Slager of, a controlled substance, were as follows:

"Q. Have you ever bought anything from Brad?

"A. Not that I can remember.

"Q. Marijuana or pills?

"A. No.

"Q. Has he ever offered you any?

"A. No.

"Q. Do you use marijuana?

"A. I don't think that it's any concern of this.

"Q. Well it's involved in this. I want you to understand that we're not trying to put you on the spot as far as your using it. We're not going to make any arrest on you or anything like this. But we do have to get down to the usage of controlled substances. Okay, you don't have to answer involving yourself. Do you know if Bruce uses marijuana?

"A. I don't know.

"Q. Have you ever been with him when he's been using it?

"A.   Not that I can remember.

"Q.   Have you ever been with him when he took acid? Has he ever told you that he took acid? You've visited him at his house several times, haven't you?

"A.   Yes.

"Q.   Have you ever seen any paraphernalia there for smoking marijuana?

"A.   That in the corner, I don't know what he uses it for. A water pipe could be used for tobacco too.

"Q.   Okay Steve, when you've been in his room before, have you seen pipes for smoking marijuana?

"A.   Yes.

"Q.   Was there quite a few pipes?

"A.   One or two that I've seen.

"Q.   I'll ask you again, have you seen Bruce smoke marijuana?

"A.   Yes.

"Q.   On how many occasions?

"A.   Once or twice.

"Q.   Could it have been  more than that?

"A.   It could have been, I'm not really sure.

"Q.   How about when he lived down on Hunter Street with this Brad from Roseau. Did you visit him down there?

"A.   Not very often.

"Q.   Had you been down to the house?

"A.   Yes.

"Q.   Was there narcotics being used down there? Acid?

"A.   No.

"Q.   Have you ever been offered acid by anyone? Bruce or by Brad?

"A.   No.

"Q.   Have you been offered marijuana by Brad?

"A.   No.

"Q.   Do you know if Brad sells marijuana?

"A.   I don't think so. Not to my knowledge.

"Q. On the day of the 22nd, Bruce got some marijuana. Did you sell it to him or give it to him? You can answer or you don't have to answer it.

"A. No, I didn't give him anything on the 22nd.

"Q. Did you give him anything on the 21st?

"A. No.

"Q. Let me put it this way. When did you come back from school from Bemidji?

"A. On the 14th.

"Q. Did you bring some stuff back for Bruce from the school?

"A. I'd rather not answer that.

"Q. What I'm mainly interested in here is that if you did, I would like to know if any acid was brought back?

"A. No.

"Q. No acid was brought back. Did you bring any marijuana back for Bruce, not for yourself? Did he ask you to bring any back?

"A. No.

"Q. So from the time you got home, you did not get any marijuana for Bruce, is this what you're telling me?

"A. Yes.

"Q. Your answer is yes that you did not bring anything back for him?

"A. Yes.

\* \* \* \* \*

"Q. Since you've been back on the 14th, did you and Bruce have any marijuana to smoke together?

"A. Yes.

"Q. On how many occasions?

"A. Once.

"Q. How much did you have to smoke?

"A. How do you mean?

"Q. How many joints or was it a lid or what?

"A. One little small bowl.

"Q. Was this at his house?

"A. Yes.

"Q. In his bedroom?

"A. Yes.

"Q. Could this have been one of the reasons why his mother and him had an argument because she could smell this stuff?

"A. I don't know for sure.

"Q. It never happened in front of you?

"A. No.

"Q. Did he ever tell you that his mother suspected him of using it?

"A. He said his mother knew about it and didn't mind.

"Q. Did he ever say his dad knew about it?

"A. No. I don't remember if he said both or one of them. I knew his mother did but I don't know for sure if his dad did or not. I think he did.

"Q. Is there anything you could add to your statement that could help us find a motive for this?

"A. As far as motive, I still believe it was accidental.

\* \* \* \* \*

"Q. If you think of anything else now, will you get in touch with us? Did you see Bruce on the 21st of December?

"A. No.

"Q. Did you see him earlier on the day of the 22nd?

"A. No.

"Q. When was the last time you and him had marijuana together?

"A. I suppose the 19th. I can't remember.

"Q. The 19th. That would've been on a Wednesday. Okay, then that's about all you've got to say at this time?

"A. Well, I suppose I better tell you. He did get it from me.

"Q. What did you bring back?

"A. One bag.

"Q. Did you sell it to him or did you give it to him?

"A. I sold it to him.

"Q. How much?

"A. Money you mean? $12.00.

"Q. Did you bring any LSD back?

"A. A little.

"Q. For him?

"A. No.

"Q. He didn't get any LSD?

"A. Not then.

"Q. Are you a pusher?

"A. No.

"Q. Just your friends?

"A. Once in awhile. If I need money bad enough. School is getting awful tight.

"Q. Just a word of advice. If you're a pusher, you won't have to worry about school if you get caught. So it isn't worth it. Did you bring some paraphernalia back for him once, some pipes?

"A. I gave him one.

"Q. If you think of anything more, will you get in touch with us?

"A. Yes."

Following this exchange, defendant was allowed to leave.

Four days later, on December 31, 1973, defendant was again requested to come to the police station for questioning. Prior to this interview, he was given the Miranda warnings. After first declining to make a statement, he consented and proceeded again to confess selling marijuana to Bruce Slager. This confession, which was recorded, was transcribed and signed by defendant later the same day. A criminal complaint was subsequently issued charging him with sale of a controlled substance.

Defendant challenged the admissibility of his inculpatory admission of December 27 and of the subsequent confession. Following a Rasmussen hearing the district court ruled that the December 27 statement was taken in violation of defendant's constitutional rights, that the December 31 confession was an im-

permissible derivation of the prior illegality, and that neither would be admissible into evidence at defendant's trial.

■ Appellant claims that until defendant voluntarily and spontaneously admitted his guilt,[2] he was not in any way a suspect, and that Miranda warnings were required only after the statement was made. The lower court viewed the entire interview as a custodial interrogation requiring the Miranda warnings prior to any questioning.

According to Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. ed. 2d 694, 10 A. L. R. 3d 974 (1966), the prophylactic warnings must be given to a person subjected to any "custodial interrogation," defined as:

"* * * [Q]uestioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U. S. 444, 86 S. Ct. 1612, 16 L. ed. 2d 706, 10 A. L. R. 3d 993.

The circumstances here do not fully indicate a custodial situation. Defendant was not "in custody," but was free to leave at any time. He was called at home and asked to come down to the police station to answer some questions regarding a murder investigation. The chief of police characterized the statement as a "witness statement," and said that his purpose was to look for a motive in the homicide. He in effect told defendant that he would not be arrested for any information he gave regarding his own usage of controlled substances but warned him about being a pusher. The chief of police also testified that he had no suspicion when he called defendant and asked him to come to the station on December 27 that defendant had furnished drugs to Slager. In fact, he had asked the same kind of questions of Brad Teubner with negative results.

■ It should be noted that defendant was not asked a specific question when, on his own initiative, he blurted out, "Well, I suppose I better tell you. He did get it from me." We feel that prior

---

[2] "Well, I suppose I better tell you. He did get it from me."

to this admission suspicion had not begun to focus on this defendant as a suspect for a particular crime. Without this element of suspicion, no warnings were needed. State v. Kinn, 288 Minn. 31, 178 N. W. 2d 888 (1970). At the point of the crucial admission, the Miranda warnings should have been given. Thus, the statements made immediately after this admission clearly should be excluded and the trial court ruled correctly as to these statements. However, the admission and the questions and answers which had preceded it are admissible.

■ In this case, if there was any derivative effect flowing from the first admission, it would be difficult to separate the effect of the admissible portion from that which we hold was inadmissible. However, assuming arguendo that the first statement was in its entirety illegally obtained, the second and more crucial question is, whether, under a derivative-evidence rule, the statements made by defendant after the warnings and waiver on December 31 were inadmissible results of the prior illegality. The lower court ruled that the December 31 statement or confession was prejudicially tainted by the prior one, and thus inadmissible on the basis of the "fruit of the poisonous tree" doctrine.[3] We do not agree because we feel that the December 31 confession was not the product of exploiting the prior illegality, but rather was obtained "by means sufficiently distinguishable to be purged of the primary taint." Wong Sun v. United States, 371 U. S. 471, 488, 83 S. Ct. 407, 417, 9 L. ed. 2d 441, 455 (1963).

The theory advanced by defendant in urging that the December 31 confession was properly held inadmissible was stated by the United States Supreme Court in United States v. Bayer, 331 U. S. 532, 540, 67 S. Ct. 1394, 1398, 91 L. ed. 1654, 1660 (1947):

"* * * [A]fter an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of

---

[3] Wong Sun v. United States, 371 U. S. 471, 83 S. Ct. 407, 9 L. ed. 2d 441 (1963).

having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first."

However, this was immediately qualified by the court:

"* * * But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a useable one after those conditions have been removed." Id.

Thus, the decision in these cases depends on the facts of the individual case, not on the application of a strict rule of law. As we recently stated in State v. Dakota, 300 Minn. 12, 18, 217 N. W. 2d 748, 752 (1974):

"We have never adopted a presumption of illegality where a challenged confession followed earlier, warningless inculpatory or exculpatory statements, but have instead evaluated each case on its own facts."

This court has in the past taken a broad view of second-confession cases. In State ex rel. Pittman v. Tahash, 284 Minn. 365, 170 N. W. 2d 445 (1969), the defendant made the first confession in the absence of warnings, and while incarcerated, to a prison superintendent; he made the second after appropriate warnings several hours later, while still incarcerated, to a sheriff. Although holding that Miranda warnings should have been given initially, we nevertheless held that there was evidence to sustain a finding of lack of taint in the second confession. Then, in State v. Hoskins, 292 Minn. 111, 193 N. W. 2d 802 (1972), we upheld the admissibility of two later written confessions as not being prejudicially tainted by a prior illegally obtained oral statement because outside investigation led to securing the confessions.[4]

---

[4] It should be noted that while the chief of police testified that the questions asked on December 31 were a direct result of defendant's confession on December 27, he also testified:

"Q. * * * Now on cross-examination were you asked whether the

Most recently, in State v. Dakota, *supra,* we found sufficient support for the trial court's admission of the defendant's post-Miranda-warning inculpatory statement which he made at the scene of the crime immediately after he had made an initial confession and then had been given the warnings. Since only one general question, "what happened," was asked before defendant was given the warnings, we held that it would be most unrealistic to picture his will as so overcome by questioning that the subsequent warnings made no impact.

The common element which runs through these decisions is the finding that prejudicial coercion upon the defendant to again confess after receiving the Miranda warnings was not present just because he had made an earlier confession which "let the cat out of the bag." We feel that the uncontroverted facts[5] of this

second statement, that is the December 31st statement, was a direct result of the interview of December 27th, do you recall that questioning?
"A. Yes, sir.
"Q. And you started to say that you had some other statements, some other investigations that transpired in between?
"A. Yes, sir.
"Q. And what investigations were they?
"MR. OISTAD: I object to this as irrelevant, Your Honor.
"THE COURT: Objection is overruled.
"A. I had taken statements from, I believe Mr. Slager and Mr. Tubener [Teubner].
"Q. After those statements in addition to the first statement taken from the defendant, was the defendant then a suspect or a person that you were further investigating for criminal activities?
"A. Yes, sir. This is when—after we had these other statements, after I read over the first statement, this is when we focused our attention on him as a suspect."

[5] The facts surrounding the taking of the first statement on December 27 are essentially undisputed. Similarly,the facts relating to the interrogation on December 31 are undisputed in the main, although there are some fact disputes such as—did the chief of police explicitly warn defendant he was under investigation for the sale of drugs to Bruce Slager. However, the Miranda warnings given to defendant were certainly broad enough to include that possibility. We assume that the

case indicate that the inadmissible portion of the first admission of December 27 did not have the effect of coercing defendant into giving the subsequent confession. In Westover v. United States, decided in the same opinion as Miranda v. Arizona, *supra,* it was suggested that a second confession would be admissible—

"* * * if an accused were taken into custody by the second authority, removed both in time and place from his original surroundings, and then adequately advised of his rights and given an opportunity to exercise them." 384 U. S. 496, 86 S. Ct. 1639, 16 L. ed. 2d 736, 10 A. L. R. 3d 1024.

In the present case, defendant was not in police custody between the two confessions, had time to reflect and seek legal advice, and was subsequently advised fully of his constitutional rights. We think that the conditions which led to the illegality of a portion of the first confession were sufficiently excised or dissipated so as not to preclude the use of the subsequent confession. The defendant was allowed to return home between the December 27 and 31 interviews, a period of four days. The police did not pick him up on December 31, but called his home and

trial court might have found that such an explicit warning was not given but we have concluded that the taint of the poisonous tree was removed without such an explicit warning. It should be noted that in his signed statement of December 31, the defendant was asked—"You realize that you can be charged for selling, don't you?" and that he answered—"Yes. I hope it won't come to that." In the light of this statement, it is unbelievable that he needed a specific warning that he might be charged with selling. His other answers at that time clearly indicated he had not been threatened by anyone, that no promises had been made to him, and that he realized at the start of the statement what the consequences would be. We recognize that in spite of his statement that no promises were made that at least one was made—that he would not be charged with usage of marijuana—and in fact he was not so charged. Because of the trial court's findings, we have not accepted the police chief's testimony that he possibly may have advised the defendant at one time or another that "being involved in drugs, selling of drugs, that you will be going to Court."

asked his mother at 10 a. m. to have him come to the police station at about 11 a. m. After the recorded statement was given, defendant left the police station and had time to reflect while it was being transcribed, and before he signed the typed statement which contained several incriminating admissions.

With time to reflect and seek advice, we do not believe that defendant's will was so overcome by his December 27 admission that the subsequent warnings made no impact upon him. In fact, our review of the record indicates that defendant was in control of his faculties and in part invited the interrogation which led to his confession of December 31.[6]

If, under the facts here, which present a more compelling case for admission of the second confession than was present in the Pittman, Hoskins, or Dakota cases, we were to uphold the lower court's "finding of fact" that the December 31 statements cannot be used by the state because of the prior warningless admission, we would be fostering uneven standards of justice.

The decision of the lower court on this issue was framed as a finding of fact. However, we view it as a conclusion of law drawn from uncontroverted facts. As was said in a footnote to Drope v. Missouri, 420 U. S. 162, 175, 95 S. Ct. 896, 905, 43 L. ed. 2d 103, 115 (1975):

" 'But "issue of fact" is a coat of many colors. It does not cover

---

[6] "Q.  Having these rights in mind, do you wish to talk to us now?
"A.  No.
"Q.  You don't want to talk to us?
"A.  I'd like to know what this is all about first.
"Q.  It would be leading up to the incident on December 22nd on the Slager shooting.
"A.  I still don't see how I'm involved. I just came up that day to see him. I'd like to know how you're trying to involve me.
"Q.  I'm not trying to involve you at all. If you're not involved, you're not. There are a few questions that we haven't got straight yet. If you want to give us an answer, fine. If you don't, that's your privilege. Do you want to answer some questions?
"A.  I'll see what the questions are."

a conclusion drawn from uncontroverted happenings, when that conclusion incorporates standards of conduct or criteria for judgment which in themselves are decisive of constitutional rights. Such standards and criteria, measured against the requirements drawn from constitutional provisions, and their proper applications, are issues for this Court's adjudication * * *. Especially in cases arising under the Due Process Clause is it important to distinguish between issues of fact that are here foreclosed and issues which, though cast in the form of determinations of fact, are the very issues to review which this Court sits.' Watts v. Indiana, 338 U. S. 49, 51 (1949) (opinion of Frankfurter, J.). See also Culombe v. Connecticut, 367 U. S. 568, 605 (1961) (opinion of Frankfurter, J.)."

A similar vein of thought runs through this court's opinion in State v. Biron, 266 Minn. 272, 280, 123 N. W. 2d 392, 398 (1963), where Mr. Justice Murphy stated:

"Moreover, it is important for us to keep in mind that since the issue before us involves a basic constitutional right the standards upon which the issue of voluntariness must be appraised are those expressed by decisions of the United States Supreme Court. The policy of that court, stated in the recent case of Haynes v. Washington, 373 U. S. 503, 515, 83 S. Ct. 1336, 1344, 10 L. ed. (2d) 513, 522, is as follows:

" 'It is well settled that the duty of constitutional adjudication resting upon this Court requires that the question whether the Due Process Clause of the Fourteenth Amendment has been violated by admission into evidence of a coerced confession be the subject of an *independent* determination here, see, e. g., Ashcraft v. Tennessee, 322 U. S. 143, 147-148; "we cannot escape the responsibility of making our own examination of the record," Spano v. New York, 360 U. S. 315, 316. While, for purposes of review in this Court, the determination of the trial judge or of the jury will ordinarily be taken to resolve evidentiary conflicts and may be entitled to some weight even with respect to

the ultimate conclusion on the crucial issue of voluntariness, we cannot avoid our responsibilities by permitting ourselves to be "completely bound by state court determination of any issue essential to decision of a claim of federal right, else federal law could be frustrated by distorted fact finding." Stein v. New York, 346 U. S. 156, 181. * * *' "

We are of the opinion, based upon the record viewed favorably to defendant, that the confession obtained on December 31 was not tainted as derivative of that portion of the statement improperly obtained on December 27.

However, we uphold the trial court's decision to exclude the December 31 confession on other grounds.

The chief of police testified that there were some off-the-record conversations between him and defendant and that he didn't know what he said. The defendant was allowed to testify as follows:

"Q. Why did you consent to answer the questions after you had already refused, Mr. Raymond?

"A. I was trying to help Bruce. They didn't convince me that it was about the Slager shooting. So they had already told me they wouldn't do anything or arrest me on it so I told him. I didn't think there would be anything to come of it as far as I was concerned. I was just trying to help Bruce to do what I could for him."

From this and the totality of the circumstances the trial court might have found that the confession made on December 31 was not made freely, voluntarily, and without compulsion or inducement of any sort. State v. Biron, 266 Minn. 272, 123 N. W. 2d 393 (1963).[7] We therefore affirm the district court's exclusion of this confession.

Reversed in part and affirmed in part.

---

[7] It was pointed out by the Supreme Court of the United States in Brown v. Illinois, 422 U. S. 590, 604, 95 S. Ct. 2254, 2262, 45 L. ed. 2d 416, 427 (1975), in a different but analogous setting: "The voluntariness of

the statement is a threshold requirement." In Brown the defendant was arrested without probable cause and without a warrant and thereafter made two in-custody inculpatory statements after being given Miranda warnings. The Illinois court adopted a per se rule that Miranda warnings broke the causal chain so that inculpatory statements, even if induced by unconstitutional custody, were admissible. This holding was reversed by the United States Supreme Court, which refused to adopt any per se rule, stating (422 U. S. 603, 95 S. Ct. 2261, 45 L. ed. 2d 427): "* * * The question whether a confession is the product of a free will under [Wong Sun v. United States, 371 U. S. 471, 83 S. Ct. 407, 9 L. ed. 2d 441 (1963)] must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test. The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, see Johnson v. Louisiana, 406 U. S. 356, 365, 92 S. Ct. 1620, 1626, 32 L. ed. 2d 152 (1972), and, particularly, the purpose and flagrancy of the official misconduct are all relevant. See Wong Sun v. United States, 371 U. S., at 491, 83 S. Ct. at 419. The voluntariness of the statement is a threshold requirement. Cf. 18 U.S.C. § 3501. And the burden of showing admissibility rests, of course, on the prosecution."