STATE of Minnesota, Respondent,

v.

Raymond Dean SICKELS, Appellant.

No. 48066.

Supreme Court of Minnesota.

Feb. 2, 1979.

---

1. See, e. g., *State v. Shevchuk,* 291 Minn. 365, 191 N.W.2d 557 (1971).

C. Paul Jones, Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., Thomas L. Fabel, Deputy Atty. Gen., Craig H. Forsman, Sp. Asst. Atty. Gen., St. Paul, Bob A. Goldman, County Atty., Albert Lea, for respondent.

WAHL, Justice.

Defendant was found guilty by a district court jury of a charge of aggravated assault, Minn.St. 609.225, subd. 2, and was sentenced by the trial court to a maximum term of 3 years in prison. Issues raised by defendant on this direct appeal relate to the

admissibility of his confession, the gun he used, and the eyewitness identification testimony. We affirm.

At 1:30 a. m. on August 17, 1976, 27 year old Thomas Furness of Duluth and 24 year old Monnie Spark of Albert Lea were talking in the back part of Furness' van, which was parked on a street in Albert Lea, when they heard a loud thud on the side door of the van. Furness, who had just parked the van minutes before, thought that he may not have parked closely enough to the curb and felt that possibly it was a policeman knocking on the door. Accordingly, he opened it immediately, only to be greeted by a man pointing a shotgun at him. This man said he was a special officer and that he had been on burglary surveillance and had been watching them. He ordered Furness to show him his identification and then entered the van, closing the door behind him. Furness complied but then after a short time tried to get up, and at this point the man struck Furness in the jaw with the butt end of the gun. After a while the man allowed Furness to sit up and even offered him a drink from the pint-sized bottle of liquor he had. By then the man was not holding the gun, but he had set it down in such a way that it was pointed at Furness. Worrying about an accidental discharge because the man had cocked it, Furness reached to push the gun away from him. At this point the man became angry, grabbed the gun, and ordered Furness to get up front and drive. Furness went up front, but instead of driving he opened the door, leaped out, and ran for help. The man then gave chase, shouting "You are dead" and "I'm going to kill you." Ms. Spark then left also and managed to flag down a police car.

She and Furness were reunited at the police station a short time later. They told police officers William Barber and Spencer Osterberg about the incident and described their assailant. They were also asked to look at a number of pictures, but none of defendant. They made no identification.

At about 3:30 that same morning Officers Osterberg and Barber answered a call from defendant's estranged wife concerning a domestic problem which she described as serious. When they got to her house they found defendant was intoxicated, that he had entered the house without his wife's permission through the basement, and that he had not only threatened suicide but had taken the preparatory step of making a noose. The officers noted that defendant fit the description of the man involved in the van incident. Suspecting that he was the man, Osterberg asked him a number of questions which, though general, (e. g., "What have you been doing the last few hours?") were designed to elicit evidence which might corroborate his suspicions. However, defendant said nothing which would implicate him.

Because of defendant's intoxicated condition, his suicide threats, and the fact that his wife did not want him in the house, Officer Osterberg decided to commit defendant to the detoxification center at Naeve Hospital in Albert Lea. Once at the hospital, apparently while defendant was being admitted, Officers Barber and Osterberg resumed questioning defendant about what he had done earlier that evening. After a few questions, none of which elicited anything significant, defendant said that he knew what they were looking for and that he would tell them what happened. At this point the officers interrupted defendant and gave him a *Miranda* warning.

After stating that he understood what his rights were, defendant proceeded to confess to the offense in question, saying that he had a fight with a man named Perry at the bar, that he thought he saw Perry get into the van, and that he went to the van with the gun because he thought Perry was inside the van. He said that after Furness escaped he threw the gun away at the Albert Lea Armory, where officers later found it, and then hid for about 15 minutes so that the police would not find him. He said that he then went home and attempted suicide but that this attempt had nothing to do with the van incident but was related to his marital breakup.

After obtaining this information Officers Barber and Osterberg left defendant and returned to the station, where they showed

Furness and Spark a 5-year-old picture of defendant. Furness said that the man in the photograph looked like he could be the man. The record is unclear whether Spark felt the same.

The prosecution gave defendant the requisite pretrial notice of its intent to introduce the evidence of the confession and the gun but made no mention that it had employed any photographic identification procedures during its investigation. Also, there was no mention of this in any of the police reports in the file which was opened to the defense. Accordingly, the defendant's pretrial motion to suppress was limited to the confession and the gun and made no mention of eyewitness identification testimony.

At the omnibus hearing defendant sought suppression of the statements on the grounds that the police should have given him a *Miranda* warning when they first questioned him and that the gun and anything he said after being given the warning were the fruits of this earlier illegality. Defendant also argued that because of his intoxication he was not capable of waiving his *Miranda* rights, thereby rendering the statements inadmissible and the gun inadmissible as a fruit of that illegality. The omnibus court ordered the suppression of all statements made by the defendant before receiving the *Miranda* warning at the hospital but admitted the gun and the statements made by him after receiving the *Miranda* warning. The court rejected defendant's argument that the gun and the statements made after he received the *Miranda* warning were inadmissible as fruits of the earlier illegality.

At trial the state's first witness was Thomas Furness. After describing the incident, he was asked by the prosecutor to identify a color photo of defendant which was taken on August 18, 1976, a little over a day after the van incident. Defense counsel then cross-examined Furness for the purpose of making an objection and learned, apparently for the first time, that on August 17th the police had shown Furness the old photo of defendant and that just before trial the police had again shown him that photo plus the photo of defendant taken on August 18th. Citing the lack of pretrial disclosure and arguing that the identification procedures used by the police were unfair, the defense counsel objected to the admission of the photos and to any in-court identification of defendant by Furness. The court sustained the objection to the admission of the photos but overruled the objection to the in-court identification. Furness then was asked to look around the courtroom and see if he could identify the man who had committed the assault. In the period preceding trial defendant had drastically changed his appearance by changing his hair style completely and by growing a beard, and he was sitting in the spectator section among four other men apparently selected by defense counsel. Furness nonetheless immediately and positively identified defendant.

Defense counsel, who never sought a midtrial hearing on the identification testimony issue, then cross-examined Furness thoroughly and elicited the full details about the identification procedures, including the facts that (1) on August 17, the police had shown them 3 to 10 pictures of people other than defendant and they had not identified anyone, (2) later on August 17, the police had shown them the 5-year-old picture of defendant and Furness had said it looked a lot like the man, and (3) just before they came to the courthouse for trial they were shown the pictures of defendant and told that defendant had changed his appearance and that he would be sitting in the spectator section with a number of other people. He testified that he immediately identified the pictures of defendant as being pictures of his assailant.

Monnie Spark gave similar testimony. She took a considerable amount of time looking at the spectators before she identified defendant but said that she had not had any hesitancy in identifying the photo of defendant taken on the 18th as being a photo of the assailant.

The police officer who showed a picture of defendant to Furness and Spark just before trial testified that he did so at the

request of the prosecution. Thereafter, in chambers, defense counsel moved to dismiss the prosecution, citing again the lack of pretrial notice and again saying that the identification procedures used were suggestive. The prosecutor responded by saying that he had directed the officers to show Furness and Spark the picture of defendant as he was the day after the crime because defendant thereafter had changed his appearance, and they felt that they should be given the opportunity to identify him as he looked then. The trial court denied the motion to dismiss. He also denied a motion for a mistrial on the ground of lack of notice or hearing.

The rest of the state's evidence dealt with the seizure of the gun and with the confession and the circumstances leading to it.

1. The first issue raised by defendant relates to the trial court's denial of the motion to suppress the confession and also the gun used in committing the assault. We hold that the trial court did not err in denying the motion to suppress.

■ (a) Defendant first argues in support of his claim that the confession and the gun were erroneously admitted and that they were the fruits of an illegal custodial interrogation, since the police acted improperly in taking him to the hospital. Because defendant was both intoxicated and suicidal and his wife wanted him removed from the house, we hold that the officers acted properly in taking him to the emergency detoxification center. See, Minn.St. 253A.04, subd. 2, which authorizes emergency commitments. There is nothing in the record to support defendant's related contention that as a matter of law the officers detained defendant solely so that they could question him in a custodial setting.

■ (b) Defendant next argues that his intoxication prevented him from understanding the *Miranda* warning and knowingly and voluntarily waiving his rights. While defendant raised this issue at the omnibus hearing, he did not pursue it vigor-

ously. The record on appeal would not justify the conclusion that the waiver was involuntary. In fact, the record indicates that, although intoxicated, defendant understood what was happening and was able to make a valid waiver.

(c) Defendant's final contention in support of his claim that it was error to admit the confession and the gun is that they were the "fruit of the poisonous tree."

■ It is important to decide, first of all, just what illegality we are talking about. The omnibus court apparently concluded that it was error to question defendant both at the house and at the hospital without first giving a warning. We believe that the questioning at the hospital before giving defendant a warning was improper, but that it was not error to question defendant at the house without first giving a warning. The test in determining the need for a *Miranda* warning is not whether the interrogation has coercive aspects to it or whether the investigation has focused on the person being questioned but whether the person being questioned is in custody or is deprived of his freedom of action in any significant way. *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), and *Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), *State v. Carlson,* 267 N.W.2d 170 (Minn.1978), and *State v. Ousley,* Minn., 254 N.W.2d 73 (1977). When defendant was removed from the house and taken to the detoxification center he was being deprived of his freedom of action in a significant way, and the officers clearly erred in failing to give him a *Miranda* warning before they questioned him at the hospital.

■ In determining whether the confession and the gun were the fruits of the illegal questioning which preceded the giving of the warning, we must decide whether the confession and the gun were obtained "by exploitation of [the illegal questioning] or instead by means sufficiently distinguishable to be purged of the primary

taint." *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). Numerous factors bear on the application of this test, including the temporal proximity of the illegality and the evidence alleged to be the fruit of that illegality, the presence of intervening circumstances, the purpose and flagrancy of the misconduct, and whether it is likely that the evidence would have been obtained in the absence of the illegality. *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978); *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *State v. Bale,* 267 N.W.2d 730 (1977); *State v. Raymond,* 305 Minn. 160, 232 N.W.2d 879 (1975).

■ We think it is significant that, while defendant may have decided to confess before he was given a *Miranda* warning, he in fact did not say anything which connected him to the assault until after he was given the warning. Further, the police did not engage in any oppressive or coercive questioning. And finally, it is important to note that when he confessed defendant informed the officers that what had kept him from confessing earlier at the house was his wife's presence. This fact, together with the other facts, such as the fact that defendant was cooperative with the police, suggests that even if the officers had warned defendant immediately at the hospital, he still would have confessed. In summary, we conclude that the trial court properly determined that the confession and the gun were not the fruit of the earlier illegality.

2. The other major issue on appeal is whether the trial court erred in admitting the eyewitness identification evidence. Defendant contends, first, that the identification procedures used were so unnecessarily suggestive as to draw into question the reliability of the identification evidence and, second, that in any event the court should have suppressed the evidence because of the lack of pretrial notice or hearing on this evidence.

■ We believe that the procedures followed by the police and prosecution were unnecessarily suggestive.[1] In an appropriate case we would not hesitate to reverse if we concluded that suggestive procedures such as those followed here were so unnecessarily suggestive as to create under all the circumstances a "very substantial likelihood of irreparable misidentification." *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). In this case, however, we hold that the trial court correctly admitted the in-court identification of the eyewitnesses. While the two showings of the defendant's picture alone to the complainants may have created a likelihood of misidentification, the facts are not before us which would make the likelihood of irreparable misidentification substantial. The complainants had an adequate opportunity to view their assailant, they paid close attention to him, their description of him fit defendant, and they identified defendant at trial even though his appearance was drastically changed. In view of all these factors, we conclude that the identification testimony was reliable.

We are troubled by the prosecutor's failure to give proper and timely notice of the identification procedures used. While we would not hesitate to reverse if the prosecutor's failure to comply with the notice re-

---

1. The police not only had strong probable cause to believe that defendant was the assailant; they had him in custody. Under the circumstances, they should have made an effort to conduct a corporal lineup. Further, even assuming that the police had to employ photographic identification procedures, they should have selected a fairly large number of suitable photographs to show the complainants along with the photograph of defendant.

As for the second photographic showup, the one which occurred on the day of trial, the prosecutor should have informed the court and opposing counsel of his desire to conduct the showup and the reason for it. The court then, with the participation of both attorneys, could have taken steps to assure the fairness of the viewing.

quirement prejudiced defendant in any way, we do not agree with defendant's contention that he was prejudiced. At no time did defendant request a midtrial hearing out of the jury's presence to determine the admissibility of the eyewitness identification evidence before any of this evidence was admitted. The matter could have been handled easily in this way. See, *State v. Kluck*, 299 Minn. 161, 217 N.W.2d 202 (1974). Instead of requesting such a hear-ing, defendant elicited much of the evidence in open court. Under these circumstances, we hold that the trial court did not err in admitting the evidence.

Affirmed.