STATE of Minnesota, Respondent,

v.

Larry Gene MERRILL, Appellant.

No. 47960.

Supreme Court of Minnesota.

Dec. 1, 1978.

C. Paul Jones, Public Defender, Kathleen A. King, Asst. Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Gary W. Flakne, County Atty., Vernon E. Bergstrom, David W. Larson and Lee Barry, Asst. County Attys., Minneapolis, for respondent.

Heard before ROGOSHESKE, PETERSON, and YETKA, JJ., and considered and decided by the court en banc.

YETKA, Justice.

Defendant Larry Gene Merrill appeals his conviction of murder in the first degree. The case was tried before a jury in Hennepin County District Court, and defendant was sentenced to life imprisonment at the St. Cloud Reformatory. He requests a new trial or, in the alternative, a modification of the verdict to murder in the second degree. We affirm.

At about noon on December 22, 1976, the body of Mrs. Abbie Miesler was discovered by her brother-in-law in the fruit cellar of her home in St. Bonifacius. Detectives Kenneth Bray and John Hartsfield of the Hennepin County Sheriff's Department arrived at the scene about an hour later. After a discussion with officers already at the scene, the detectives visited the neighbors directly across the street from Mrs. Miesler's house. They learned from these neighbors, the Wartmans, that defendant rented the upstairs portion of the Miesler residence and that he worked at Technical Ordnance Company. They also learned that during the past few days the Wartmans had not seen any strangers in the neighborhood, that they had seen only defendant during that period, and that he had had some problems with his car and had asked them for help with the repairs.

They then returned to the Miesler residence to investigate the scene. Detective Hartsfield observed the exterior of the house and found no signs of a possible break-in, except a broken screen. Inside the house on the ground floor, the detectives observed what appeared to be blood in the kitchen, on the carpet adjacent to the bedroom, on the bed, and on the bedroom wall. The blood markings in the kitchen were streaked, as if someone had attempted "to clean up something." Pieces of glass were found in the bedroom area as well as in the bed itself, and the remains of a glass candy dish were found on a dresser just outside the bedroom door. In the basement, two blood-soaked mops were found; a large puddle of blood was found at the bottom of the stairs, and there were blood streakings leading to the body. Numerous stab wounds were observed in the chest and abdomen of the body.

Later that afternoon, the detectives went on separate assignments. At approximately 3 p. m., Bray dictated the probable cause portion of an application for a warrant to search defendant's upstairs apartment. Bray had the warrant signed by a judge in Hennepin County District Court and returned to St. Bonifacius with the warrant some time after 5 p. m.

Hartsfield went to Technical Ordnance where he learned that defendant had terminated his employment that morning. He was told that defendant was going to work at a foundry in St. Bonifacius with his uncle and obtained a pair of company work boots that had been turned in by defendant.

At about 4 p. m., Hartsfield returned to the Wartman residence. While he was there, defendant and his brother appeared outside the door of the Wartman home. Hartsfield arrested both men for "probable cause homicide." The men were advised of their rights, searched, and placed in separate squad cars. When defendant was asked if he understood his rights, he said that he did and also said, "Homicide? That's murder."

Hartsfield then went to the Miesler residence and made a cursory search of defendant's apartment. A more thorough search of the apartment was made after Bray arrived with the search warrant.

At 6:45 p. m., Captain Charles Ostlund and Bray transported defendant to the Hennepin County Jail. Ostlund informed defendant of his *Miranda* rights and asked defendant if he understood them. Defendant indicated that he did understand and, in addition, said that he did not know any-

thing about the crime. Ostlund and Bray told defendant they had developed probable cause to believe he was the person who had committed the crime, that that was why he was being transported to the county jail, that during the search of his apartment several pieces of incriminating evidence had been found, and that, the way things looked, they would go for a first degree homicide complaint. Again, defendant indicated that he knew nothing about the crime.

Bray informed defendant that there were different degrees of murder and that under certain circumstances a first degree murder charge "could be reduced all the way down to manslaughter." Bray told defendant that he had personally worked on an incident involving an argument in which the individual responsible for the killing was charged with manslaughter. Defendant was further told by Ostlund that in his opinion, based on 20 years experience as a police officer, Mrs. Miesler had not been murdered by professionals. Defendant then said that he would give a confession downtown.

The detectives continued their questioning, and defendant told them the following story: On the night of December 16, 1976, he drank 12 beers and three-fourths of a pint of brandy. On his way home, some time after 1:30 a. m., his car skidded off the road and hit a tree. He stopped at a gas station to get some water for his radiator. When he arrived at home, he slammed the door, and Mrs. Miesler yelled out, "Who's there?" Defendant then talked to her about the rent that was due, asking for a postponement so that he could buy Christmas presents. Mrs. Miesler said no, that she needed the money. There was further conversation and she started to scream. Defendant hit her over the head with a candy dish until the dish broke. When she started to choke, he panicked. He went into the kitchen and obtained a knife with which he stabbed her several times. He then changed his clothes, picked up the glass, dragged the body to the basement doorway, and pushed it down the stairs. He then went upstairs and "passed out" on

the floor. When the detectives asked defendant where the knife was, he told them where in his apartment they could find it.

Later that same evening, defendant essentially retold this story in the Hennepin County Sheriff's Office. After making this statement, defendant spoke with his mother by telephone and told her he was being held in jail "[f]or manslaughter."

An omnibus hearing was held on March 4, 1977, in Hennepin County District Court. The court ruled that the arrest and the search, insofar as the items seized were specified in the warrant, were lawful. It also ruled that the defendant's statements were legally obtained and that all the evidence was constitutionally admissible. The statements and evidence were admitted at trial.

Defendant raises the following issues on appeal:

1. Did the trial court's denial of defendant's request for jury instructions on lesser included charges result in prejudicial error to defendant?

2. Were defendant's waiver of his right to remain silent and his statements to the police involuntarily given in response to improper police inducement and the statements therefore improperly admitted?

3. Were statements made by defendant subsequent to his warrantless arrest obtained as the result of an illegal arrest and therefore inadmissible?

4. Did the search of defendant's apartment prior to obtaining a search warrant violate defendant's right against unreasonable search?

5. Did the facts stated in the affidavit accompanying the application for a search warrant sufficiently establish probable cause for a warrant to issue?

6. Was the evidence presented at trial sufficient, as a matter of law, to justify a verdict of murder in the first degree?

1. Denial of motion requesting jury instructions on lesser included charges.

Defense counsel moved for inclusion of lesser included charges in the jury instruc-

tions prior to the omnibus hearing. At the time of that hearing, the matter was reserved until the time of trial. The motion was renewed at the time of trial, and the trial court denied the motion. The jury was instructed only on murder in the first degree and murder in the second degree. Defendant argues on appeal that the failure to instruct the jury in the lesser included charges of murder in the third degree and manslaughter in the first degree was prejudicial error.

■ In *State v. Leinweber*, 303 Minn. 414, 422, 228 N.W.2d 120, 125 (1975), we enunciated the following two-part test for determining when lesser degrees of an offense must be submitted to the jury: (1) the evidence would reasonably support a conviction of the lesser degree, and (2) the evidence would justify a finding of not guilty of the greater offense. When this two-part test is satisfied, the trial court must submit to the jury such lesser degrees as are warranted by the evidence. Failure to submit such lesser degrees is not reversible error if no prejudice to defendant results or if defendant waives that submission.

■ Murder in the third degree is defined in Minn.St. 609.195(2)[1] as an act that—

 " * * * without intent to effect the death of any person, causes the death of another by * * * the following means * * * :

 * * * * * *

 "(2) Commits or attempts to commit a felony upon or affecting the person whose death was caused or another, except rape or sodomy with force or violence within the meaning of section 609.-185."

Manslaughter in the first degree is defined in Minn.St. 609.20(2)[2] as—

 "Caus[ing] the death of another in committing or attempting to commit a crime with such force and violence that death of or great bodily harm to any person was

reasonably foreseeable, and murder in the first or second degree was not committed thereby * * *."

Both of these offenses require that the killing be done without intent to cause death.

■ Defendant argues that the evidence submitted could reasonably support finding that he did not intend to cause the death of Mrs. Miesler and that he was incapable of forming the requisite intent because he was intoxicated at the time of the crime. Defendant further argues that "the court in essence decided the issue of intent" when it submitted instructions only on murder in the first and second degree. Defendant's implicit argument—that the jury could reasonably have concluded that he intended to inflict great bodily harm on Mrs. Miesler and therefore might have concluded that he intended the death of Mrs. Miesler rather than find him not guilty of any crime—would be more persuasive if the jury had found defendant guilty of murder in the second degree. This case is thus unlike *State v. McDonald*, Minn., 251 N.W.2d 705 (1977), where only one charge was submitted to the jury and there was a genuine issue about one of the necessary elements of the crime. We determined there that if the jury had been given the option, the defendant might have been convicted of the lesser offense. In the instant case, however, the verdict of guilty of murder in the first degree indicates that the jury believed the defendant not only had the requisite intent but also acted with premeditation and that the failure to submit instructions on the lesser offenses did not prejudice defendant on the issue of intent. See, *State v. Keaton*, 258 Minn. 359, 366, 104 N.W.2d 650, 656 (1960).

**2. Voluntariness of waiver of right to remain silent and of confession.**

Prior to the omnibus hearing, defense counsel moved that defendant's statements to police officers be excluded because "obtained improperly under the Minnesota

---

1. Defendant restricted his request to subsection 2.

2. Defendant restricted his request to subsection 2.

Constitution, Article I, and the United States Constitution, Amendments IV, V, VI, XIV as the fruits of an illegal arrest." The district court denied the motion, and the statements were admitted at trial. Defendant argues on appeal that because of improper police inducement, he did not voluntarily waive his right to remain silent and, consequently, his confession is inadmissible.

■ In order for a statement taken from an accused during custodial interrogation to be admitted, the prosecution must prove that the accused knowingly and intelligently waived his right against self-incrimination, *Miranda v. Arizona,* 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694, 724 (1966), and that the statement was freely and voluntarily made, see, *Haynes v. Washington,* 373 U.S. 503, 513, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513, 520 (1963).

■ "Waiver" is defined as " 'an intentional relinquishment or abandonment of a known right or privilege,' " *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938). Thus, an accused must "know" his rights before he can "waive" them. The principal function of the warning required by the *Miranda* decision is to ensure that the accused is aware of his constitutional rights. 384 U.S. at 468, 86 S.Ct. at 1625, 16 L.Ed.2d at 720. But the prosecution must not only show that the warning has been given, it must also demonstrate that the accused voluntarily waived his rights.[3] An express statement by the accused that he is willing to answer questions is the best indication that

he has voluntarily waived his right to remain silent. But waiver can be inferred from other conduct, for example, answering questions without hesitation or volunteering information in the absence of questioning. To determine whether a defendant's conduct implies an effective waiver, a court must look at the circumstances of the particular case. *Miranda v. Arizona, supra,* at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724. Absent circumstances indicating that the accused did not understand the warning or that his statements were not freely and voluntarily made, a confession made by an accused after he has been given a *Miranda* warning may imply that he has voluntarily waived his right to remain silent.[4] The burden is on the state to prove that such circumstances did not exist.

"[A]ny evidence that the accused was threatened, tricked, or cajoled into a waiver will * * * show that the defendant did not voluntarily waive his privilege." *Miranda v. Arizona, supra,* 384 U.S. at 476, 86 S.Ct. at 1629, 16 L.Ed.2d at 725.

■ Similarly, to determine whether a confession is voluntary, or whether the statements made by police officers to an accused have induced a confession, a court must look at the totality of the circumstances. See, *Haynes v. Washington, supra,* 373 U.S. at 513, 83 S.Ct. at 1343, 10 L.Ed.2d at 521; *State v. Raymond,* 305 Minn. 160, 174, 232 N.W.2d 879, 888 (1975); *State v. Biron,* 266 Minn. 272, 282, 123 N.W.2d 392, 398 (1963). If the circumstances indicate that the accused's will was overborne, his confession is not voluntary. See, *Lynumn*

---

3. The only issue raised on appeal is the voluntariness of defendant's waiver and confession. Defendant does not argue that his waiver was not knowing and intelligent.

4. The rule that a confession must be voluntary to be admissible was not changed by the *Miranda* decision. That decision only imposes the additional requirement that the accused must be informed of his rights before police interrogation begins. *Miranda v. Arizona,* 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966).

 Whether an accused has waived his right to remain silent and whether he has confessed

voluntarily are two separate issues. It is possible that an accused might waive his right to remain silent by expressly stating that he is willing to answer questions and yet, by improper police tactics, be coerced into giving an involuntary confession. In the present case, however, because the defendant did not *expressly* waive his right to remain silent, waiver must be inferred from his conduct, specifically his statements to the police officers in the car and at the courthouse. Both of these statements were made after the alleged improper influence. Therefore, the voluntariness of his confession is the proper focus for both issues.

*v. Illinois*, 372 U.S. 528, 534, 83 S.Ct. 917, 920, 9 L.Ed.2d 922, 926 (1963). The interrogator need not use threats of physical harm or intimidating interrogation techniques for a court to find that he has exerted improper influence. See, *Bram v. United States*, 168 U.S. 532, 542, 18 S.Ct. 183, 187, 42 L.Ed. 568, 573 (1897).

The leading case in Minnesota on the issue of improper influence by police officers in obtaining a confession is *State v. Biron, supra.* This court stated in that case:

> "It should be realistically conceded that the trustworthiness of a confession should not in every instance be discounted because investigative officers in their interviews might have made discursive or imprecise statements to the defendant. But it should also be conceded that persuasive arguments calculated to induce a confession might be as objectionable as outright coercion." 266 Minn. 282, 123 N.W.2d 399.

The circumstances of the *Biron* case easily led to a conclusion that the confession was involuntary. The defendant was expressly told that if he cooperated the police would have his case brought before juvenile court, and that if he did not cooperate, they would not even consider seeking juvenile court proceedings. The police clearly implied that they had influence with the juvenile court. 266 Minn. 272, 277, 123 N.W.2d 392, 395. The police also held out the possibility that the defendant might be charged with a lesser offense if he confessed. Id. at 275, 123 N.W.2d at 395.[5]

In the present case, appellant contends that the detectives' statements led him to believe that if he made a statement he would be charged with manslaughter. Thus, he claims, his statements were involuntary because improperly induced and should have been found inadmissible.

The facts are essentially undisputed. At the beginning of the trip to the jail, defendant was given a *Miranda* warning and asked if he understood his rights. He then said that he did not know anything about the crime. One or both of the two detectives informed defendant that they had enough evidence to establish probable cause to charge him with first degree murder, that there were different degrees of murder, depending on the circumstances of the crime, and that in a previous case a man had been charged with manslaughter under similar circumstances. After these statements were made, defendant said that he would give a confession when they got into town. The detectives continued to question defendant, and he made inculpatory statements both in the car and, later, at the courthouse.[6] In a phone call to his mother following his statements, defendant said he was being held for manslaughter.

The question presented is whether the detectives' statements to defendant amount to "persuasive arguments calculated to induce a confession."[7] *State v. Biron, supra*, 266 Minn. at 282, 123 N.W.2d at 399.

■■■ Here, the detectives did not make any actual or implied promises to defendant. Although he may have concluded that he would be charged with manslaughter (as implied by his statement to his mother), the officers did not say that he would be so charged. The rules that waiver and confession must be voluntary are de-

---

5. The facts of *Raymond* are not so extreme as those of *Biron* but do suggest that the police chief misled the defendant about the purpose of the interrogation. The defendant testified that the police " '* * * had already told me they wouldn't do anything or arrest me on it so I told him. I didn't think there would be anything to come of it as far as I was concerned. I was just trying to help Bruce to do what I could for him.' " *State v. Raymond*, 305 Minn. 160, 174, 232 N.W.2d 879, 888 (1975).

6. Because there is no indication of a change in circumstances between the statement in the car and the statement at the courthouse, if the first is found to have been obtained in violation of defendant's constitutional rights, the second must also be found constitutionally invalid.

7. The trial court did not specifically address this issue in ruling the statements admissible, but, even if it had, this court can make an independent determination whether the statements were voluntary. See, *State v. Raymond, supra*, 305 Minn. at 172, 232 N.W.2d at 887.

signed to deter improper police interrogation, but the police must also be allowed to encourage suspects to talk where the suspect has not clearly refused. The statements of the officers here were designed to encourage defendant to talk by informing him about the evidence against him and the possible charges. Defendant had not clearly asserted his right to remain silent and could freely and voluntarily decide to make a statement.

3. Validity of the arrest.

Defendant was arrested without a warrant. Prior to the omnibus hearing, defense counsel moved for suppression of defendant's statements to police officers on the ground that they were fruits of an illegal arrest. The district court denied the motion, finding that there was sufficient probable cause for defendant's arrest. Defendant argues on appeal that because his warrantless arrest was based on mere suspicion, not probable cause, it was unconstitutional. He further argues that his statements were obtained as a result of the illegal arrest and thus inadmissible.

■■■ The fourth and fourteenth amendments of the United States Constitution and Minn.Const. art. 1, § 10, guarantee the right to be free from unreasonable searches and seizures and require that warrants issue only upon probable cause. Minn.St. 629.34(3) authorizes a peace officer to make an arrest without a warrant "[w]hen a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it." The constitutional requirement of "probable cause" and the statutory requirement of "reasonable cause" are synonymous. *State v. Harris*, 265 Minn. 260, 263, 121 N.W.2d 327, 330 (1963).

■■■ Because of the importance of protecting the individual against unreasonable government intrusion into his life, the United States Supreme Court has encouraged law enforcement officers to obtain arrest warrants whenever possible. See, e. g., *Gerstein v. Pugh*, 420 U.S. 103, 113, 95 S.Ct. 854, 862, 43 L.Ed.2d 54, 64 (1975); *Beck v.*

*Ohio*, 379 U.S. 89, 96, 85 S.Ct. 223, 228, 13 L.Ed.2d 142, 147 (1964). This court has found that—

"* * * [a]ny arrest made without a warrant, if challenged by the defendant, is presumptively invalid, and the burden is upon the state to justify it as one not only authorized by § 629.34 but also as one not violative of the guarantee of the Fourth Amendment to the United States Constitution against any invasion of privacy except upon a showing of probable cause." *State v. Mastrian*, 285 Minn. 51, 56, 171 N.W.2d 695, 699 (1969), certiorari denied, 397 U.S. 1049, 90 S.Ct. 1381, 25 L.Ed.2d 662 (1970).

However,

"* * * the test is not the reasonableness or practicality of obtaining a warrant, but the reasonableness of the * * * arrest." *State v. McConoughey*, 282 Minn. 161, 165, 163 N.W.2d 568, 571 (1968).

The state must present evidence to the trial court indicating that, at the time of the arrest, the police had factual information from reliable sources from which they could conclude that there was probable cause to believe that the defendant had participated in the felony. *State v. Mastrian, supra*, 285 Minn. at 56, 171 N.W.2d at 699. By looking at the facts and circumstances of the particular case, the trial court must determine—

"* * * whether an officer in the particular circumstances, conditioned by his own observations and information, and guided by the whole of his police experience, reasonably could have believed that a crime had been committed by the person to be arrested." *State v. Sorenson*, 270 Minn. 186, 196, 134 N.W.2d 115, 123 (1965).

■■■ Although suspicious circumstances are insufficient for a warrantless arrest, *State v. Clark*, Minn., 250 N.W.2d 199, 202 (1977)—

"[t]he line between what is mere suspicion and what constitutes probable cause has been characterized as a troublesome one which must be approached in a prac-

tical, nontechnical manner. What is reasonable must necessarily depend upon the facts of each case." *State v. Clifford*, 273 Minn. 249, 252, 141 N.W.2d 124, 126 (1966).

■ In the present case, there are several facts that might lead a reasonable person to believe that a crime had been committed and that it was probable that defendant had been involved in that crime. He was known, on the basis of the neighbors' information, to be living at the victim's house; he had not said anything to the neighbors about her disappearance, although the neighbors had seen and talked to him since the last time she was seen; the neighbors had not seen any strangers in the neighborhood; there was no obvious sign of forced entry; his work boots were apparently stained with blood;[8] there were indications that someone had tried to clean up or conceal blood stains in the house; the house seemed otherwise to be undisturbed. Based on the experience of his 13 years as a police officer, including 6 years as a detective in the criminal division, Detective Hartsfield could reasonably have believed that defendant had probably been involved in the death of Mrs. Miesler.[9] The United States Supreme Court, in *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879, 1891 (1949), reasoned that—

"' * * * [b]ecause many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. * * * '" *State v. Sorenson*, 270 Minn. 186, 198, 134 N.W.2d 115, 123 (1965).

Here Detective Hartsfield's conclusion of probability could reasonably have been drawn from the facts known to him.[10]

Since the arrest was legal, any statements given by defendant subsequent to that arrest were not obtained by violating his rights under the fourth amendment.

4. Validity of search of defendant's apartment prior to issuance of search warrant.

■ Because defendant did not raise this issue at either the omnibus hearing or the trial, it cannot be considered on appeal. See, *State v. Kremer*, 307 Minn. 309, 312, 239 N.W.2d 476, 478 (1976); *State v. La-Barre*, 292 Minn. 228, 237, 195 N.W.2d 435, 441 (1972). Further, it appears from the record that only a "cursory search" of defendant's apartment was made prior to the arrival of the search warrant and that no evidence was seized until after the warrant arrived. Thus, if there was an unconstitutional invasion of defendant's privacy, it did not result in the admission of evidence at trial that would require reversal of defendant's conviction.

5. Sufficiency of facts asserted in affidavit for search warrant.

Prior to the omnibus hearing, defense counsel moved to suppress evidence obtain-

---

**8.** Whether there were signs of forced entry and whether the boots were stained with blood are disputed facts, but are only two of several factors that might have led Detective Hartsfield reasonably to conclude that defendant was involved in the crime.

**9.** In previous cases, reasonable cause for arrest has been found where the facts known by the police were less convincing than those here. In *State v. Bean*, 280 Minn. 35, 157 N.W.2d 736, certiorari denied, 393 U.S. 1003, 89 S.Ct. 493, 21 L.Ed.2d 468 (1968), for example, the arrest of the female defendant was held valid although the only information the police had was that one of the burglars was a female, the defendant was a friend of a man suspected to be the male burglar, and the car the couple used to leave the scene of the crime was in her yard. In *State v. Olson*, 271 Minn. 50, 135 N.W.2d 181 (1965), defendant's arrest was found valid where a witness stated that she thought the defendant had narcotics in an envelope, but that she did not know what was in the envelope and would not know marijuana if she saw it.

**10.** Defendant also contends that there was no need to arrest him because he was not attempting to flee. Although this may be true, Detective Hartsfield might reasonably have believed that if defendant were not arrested, he would flee, even if he had previously been told that defendant had stated he intended to work at a foundry in the area.

ed pursuant to the search warrant issued on December 22, 1976, on the ground that the affidavit in support of the application for the warrant failed to state facts sufficient to establish probable cause for issuance. The trial court denied the motion, finding the affidavit sufficient, and ruled that all evidence seized pursuant to the warrant, except that not described in the inventory and return, was admissible. Defendant argues on appeal that the affidavit failed to allege facts sufficient to establish probable cause and that it failed to establish that information obtained from unidentified informants was reliable.

 Both the Federal and Minnesota constitutions require that no warrant shall be issued absent a showing of probable cause for search. U.S.Const. Amend. IV; Minn.Const. art. 1, § 10. Three requirements are necessary for a search warrant to comply with constitutional standards: (1) "a neutral and detached magistrate," not the police officer engaged in "ferreting out crime," is to determine whether probable cause authorizing a search exists, *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436, 440 (1948); (2) in making that determination, the magistrate is to consider only the information presented at the time of the application for the search warrant, *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); and (3) the affidavits for the search warrant "must be tested and interpreted by [the magistrate] * * * in a common-sense and realistic fashion." *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684, 689 (1965). *State v. LaBarre, supra*, 292 Minn. at 233, 195 N.W.2d at 439.

 It is the adequacy of the affidavit that is at issue here. The facts alleged in the affidavit included the following: the body of the victim was found in the fruit cellar of her home; the home had not been disturbed; efforts had been made to conceal the blood; defendant was a tenant of the upstairs portion of the victim's home; the victim had not been seen for several days prior to the discovery of her body;

defendant had been seen at the house during that period. The first three facts were based on the officer's personal observations; the last three were learned by the officer from the victim's neighbors and relatives.

 An affidavit may be based on hearsay information. But the magistrate, in order to determine whether such information is sufficient to establish probable cause, must be informed of the basis for the informant's knowledge and of the reasons for the officer's conclusion that the informer is credible or his information reliable. *Aguilar v. Texas, supra*, 378 U.S. at 114, 84 S.Ct. at 1514, 12 L.Ed.2d at 729. In this case, information was given by "relations" and "neighbors." The affidavit states that the neighbors' information was based on their personal observations of the victim and defendant. Although ideally the officer should have articulated his reasons for believing these persons, the magistrate could, using his common sense, reasonably find that "neighbors" and "relations" are likely to give reliable information to the police.

This court has stated that—

"'* * * the test of probable cause is met if the affidavit sets forth competent evidence sufficient to lead a reasonably prudent man to believe that there is a basis for the search.'" *State v. McConoughey*, 282 Minn. 161, 167, 163 N.W.2d 568, 573 (1968), quoting *State v. Suess*, 280 Minn. 308, 312, 159 N.W.2d 180, 182 (1968).

The facts personally observed by the officer are sufficient to establish that a crime was committed and that it was committed in the victim's home. This information, together with the information from the neighbors and relatives about defendant, was sufficient to lead a reasonably prudent person to believe that there might be additional evidence in defendant's rooms.

 Assuming, arguendo, that the warrant was not properly issued, only two pieces of evidence seized pursuant to the warrant were admitted at trial: the jackknife and the blue shirt. In light of the amount of incriminating evidence present-

ed, it is unlikely that the admission of these two pieces of evidence was prejudicial. Although evidence seized pursuant to an illegal warrant is inadmissible, *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), absent prejudice to the defendant, improper admission does not require reversal of defendant's conviction.

6. Sufficiency of evidence for verdict of murder in the first degree.

Defendant contends that the evidence was, as a matter of law, insufficient to establish premeditation beyond a reasonable doubt and cannot sustain a conviction of murder in the first degree.

 In reviewing a claim of insufficiency of the evidence, we are limited to ascertaining whether, given the facts in the record and the legitimate inferences that can be drawn from those facts, a jury could reasonably conclude that the defendant was guilty of the offense charged. *State v. Whelan,* 291 Minn. 83, 85, 189 N.W.2d 170, 172 (1971); *State v. Norgaard,* 272 Minn. 48, 52, 136 N.W.2d 628, 631 (1965). We cannot retry the facts, but must take the view of the evidence most favorable to the state and must assume that the jury believed the state's witnesses and disbelieved any contradictory evidence. *State v. Darrow,* 287 Minn. 230, 235, 177 N.W.2d 778, 781 (1970); *State v. Ellingson,* 283 Minn. 208, 211, 167 N.W.2d 55, 57 (1969); *State v. Thompson,* 273 Minn. 1, 36, 139 N.W.2d 490, 515, certiorari denied, 385 U.S. 817, 87 S.Ct. 39, 17 L.Ed.2d 56 (1966). If the jury, giving due regard to the presumption of innocence and to the state's burden of proving the defendant's guilt beyond a reasonable doubt, could reasonably have found the defendant guilty, that verdict will not be reversed. *State v. Norgaard, supra,* 272 Minn. at 52, 136 N.W.2d at 632.

Minn.St. 609.185 defines murder in the first degree as—

"Caus[ing] the death of a human being with premeditation and with intent to effect the death of such person * * *."

In the present case, defendant attempted to create reasonable doubt as to premeditation by arguing that he was intoxicated at the time of the crime. This court has stated that a defendant's state of intoxication at the time of a killing may properly be considered in determining whether he acted with premeditation, *State v. Neumann,* 262 N.W.2d 426, 431 (Minn.1978), but in adopting that rule, it reaffirmed the rule that the fact that a defendant had been drinking alcoholic beverages prior to the killing does not raise a presumption that he was incapable of premeditation, id.; cf. *State v. Lund,* 277 Minn. 90, 92, 151 N.W.2d 769, 771 (1967) ("The mere fact of a person's drinking does not create a presumption of intoxication, and the possibility of intoxication does not create the presumption that a person is rendered incapable of intending to do a certain act."). Whether the defendant's drinking did render him incapable of acting with premeditation is a question for the trier of fact. *State v. Neumann, supra,* 262 N.W.2d at 431. Here the defendant told police officers he had drunk 12 beers and three-quarters of a pint of brandy on the night of the killing. Two of the state's witnesses testified, however, that defendant did not appear to be intoxicated and did not act drunk. The owner of the tavern where defendant had been drinking also testified that he had served defendant only 5 or 6 beers. Although defense counsel attempted to attack the credibility of these witnesses, judging the credibility of witnesses is clearly a function of the jury, *State v. Thompson, supra,* 273 Minn. at 36, 139 N.W.2d at 515, and the jury here could reasonably have believed the testimony of these witnesses and rejected defendant's attempts to discredit them. The jury would thus have found that defendant's drinking did not render him incapable of acting with premeditation.

 The "premeditation" required for a finding of murder in the first degree has been statutorily defined to mean "to consider, plan or prepare for, or determine to commit [the alleged act] prior to its commission." Minn.St. 609.18. Because, by definition, premeditation is a product of the

mind and wholly subjective, its existence must be inferred from objective manifestations. *State v. Gowdy*, 262 Minn. 70, 74, 113 N.W.2d 578, 581 (1962). The jury need not be given direct proof of premeditation from other evidence. *State v. Campbell*, 281 Minn. 1, 12, 161 N.W.2d 47, 55 (1968).

Defendant cites *State v. Swain*, 269 N.W.2d 707 (Minn.1978), in which this court reduced a conviction from first to second degree murder where a son murdered his mother but where there was nothing but circumstantial evidence and no direct evidence of premeditation at all. The *Swain* case differs from the case at bar because here the defendant admits first striking the decedent with a candy dish, then going into the kitchen to search for a knife, finding a knife, and then returning to the bedroom and stabbing the victim 17 times.

Thus, the jury, by interpreting all the evidence favorably to the state, could reasonably have concluded that the defendant acted with premeditation in killing Mrs. Miesler. That he may not have been determined to kill her when he first returned to the house does not preclude the possibility that he determined to kill her during the course of the argument or after he had hit her with the candy dish. His actions in going into the kitchen, obtaining the knife, returning to the bedroom, and stabbing the victim numerous times reasonably imply that he had determined to kill Mrs. Miesler. Even if he only formed that determination when he found the knife, he acted with premeditation when he stabbed her.[11]

Because the evidence, viewed in favor of the prosecution, could reasonably lead the jury to conclude that the defendant acted with premeditation, the jury's verdict will not be reversed for insufficiency of evidence.

Affirmed.

11. The medical examiner who performed the autopsy on Mrs. Miesler's body noted 17 stab wounds in the chest and upper abdomen and lacerations on the face and head, one of which was a very serious injury in itself. He stated at trial that given enough time the injury to the scalp might have been fatal, but that in this case the cause of death was loss of blood resulting from the multiple stab wounds. Thus, defendant's determination at the time he stabbed Mrs. Miesler is necessary to finding the requisite premeditation.