**STATE of Minnesota, Respondent,**

v.

**Joseph BLAIR, Appellant.**

**No. C3–85–1680.**

Court of Appeals of Minnesota.

Feb. 25, 1986.

Review Denied April 11, 1986.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas L. Johnson, Hennepin Co. Atty., J. Michael Richardson, Asst. Co. Atty., Minneapolis, for respondent.

C. Paul Jones, Minnesota Public Defender, Mollie G. Raskind, Asst. Public Defender, Minneapolis, for appellant.

Considered and decided by LESLIE, P.J., and PARKER and CRIPPEN, JJ., with oral argument waived.

## OPINION

CRIPPEN, Judge.

Appellant Joseph Blair was convicted by jury of first degree intrafamilial sexual abuse for the sexual assault of his 15-year old sister. *See* Minn.Stat. § 609.3641, subd. 1(1) (1984). Blair appeals his conviction, claiming insufficient evidence. We affirm.

## FACTS

Criminal charges were brought against appellant following allegations made by his sister, J.B., about an incident that occurred on July 31, 1984. Appellant did not testify at trial and did not call any witnesses on his behalf. The witnesses for the prosecu-

tion provided the following account of the events of July 31, 1984:

Appellant spent the morning visiting his mother at her St. Paul home. In the early afternoon, J.B. arrived home for lunch. Appellant offered to take her out to eat and she agreed, after getting permission from their mother. Both J.B. and her mother testified that it was not unusual for the siblings to go out together.

After they ate, appellant took J.B. to his apartment, saying he had to pick up something there. They had not been in the apartment very long before appellant made some sexual advances towards J.B., which she rebuffed, telling him to "knock it off and leave her alone." Appellant instead picked her up and carried her over his shoulder into the bedroom, where he threw her on the bed. Although J.B. struggled to resist him, appellant held her down, partially undressed her, and completed vaginal intercourse with her. J.B. testified that she wanted to scream or yell but was unable to because she "just froze." The assault occurred at approximately 4:30 p.m.

Appellant finally released J.B. and went into the bathroom to clean up. He told J.B. she could clean up too, but she just put her clothes back on and went down to the car. Appellant then drove her home. When they arrived, J.B. went quickly into the house and into her bedroom. Appellant drove off in his car. J.B.'s mother testified that she was irritated at J.B. because she was late getting back from lunch with appellant and because she walked right by her without responding when her mother spoke to her. Her mother followed her into her room to chastise her and found that she was very nervous and upset. J.B. told her only that she did not feel well. J.B. testified that she did not tell her mother about the assault because she did not know if her mother would believe her and she was afraid of her reaction to such an accusation against her son.

J.B. stayed in her bedroom until about 6:00, when her boyfriend, Richard Mathewson, came by the house. Mathewson testified that J.B. was crying and upset but would not tell him why. They went together to buy parts for Mathewson's car. Mathewson testified that J.B. was upset during the trip and afterwards, but that she would not explain anything to him, despite his repeated requests. J.B. testified that she wanted to talk to her boyfriend about the assault, but she could not find the right time or place. When Mathewson and J.B. left the store, they drove to a restaurant where J.B. asked Mathewson if it was wrong for a brother and sister to have sexual contact. She then told him about appellant's assault on her that afternoon. She testified that she told Mathewson because "he was the only one I felt comfortable telling that to."

Mathewson immediately left the restaurant and drove J.B. home. When they got to the house, J.B. was fearful and wanted to stay in the car, but Mathewson insisted she come in with him. Mathewson entered the house, awakened J.B.'s mother, and told her what J.B. had told him. J.B. tried to go into her own bedroom but Mathewson pulled her into her mother's room. He testified that J.B. was hysterical. Mathewson then left J.B. and her mother alone and went back out to his car. He later met them at the hospital.

J.B.'s mother testified that J.B. was "really scared" and crying. She called their family doctor, who told her to take J.B. to St. Paul-Ramsey Medical Center. Without permitting J.B. to shower or change clothes, her mother went with her to the hospital, arriving about 8:00 p.m.

At the hospital, J.B. was given a sexual assault examination. The doctor who examined her testified that she complained of back pain from being carried over her brother's shoulder into his bedroom. He testified that she was so tense that even after giving her some deep breathing exercises he was unable to examine her uterus. The doctor did not find any evidence of semen on J.B.'s skin.

The laboratory results of tests done on specimens taken from J.B. during the sexual assault examination revealed semen on her underwear and in her vagina. The medical examiner for St. Paul-Ramsey

Medical Center testified that the test results conclusively showed that intercourse had occurred within a "matter of hours" prior to the sexual assault examination. Because Mathewson indicated that he and J.B. had sexual intercourse on the morning of the day before the assault, the doctor was also asked if it was possible that the tests reflected sexual intercourse 24 hours or more before the examination. The doctor testified that it was not possible. Other medical test results were inconclusive.

A police officer who took a statement from J.B. about 10 days after the assault testified that she had a difficult time giving the statement, was very upset, and began to cry at different points while talking to him.

## ISSUE

Was the evidence sufficient to uphold the jury's verdict?

## ANALYSIS

■ In reviewing a claim of insufficiency of the evidence, the appellate court must take the view of the evidence most favorable to the state and must assume that the jury believed the state's witnesses and disbelieved any contradictory evidence. If the jury, giving due regard to the presumption of innocence and to the state's burden of proving the appellant's guilt beyond a reasonable doubt, could reasonably have found appellant guilty, that verdict will not be reversed. *State v. Turnipseed*, 297 N.W.2d 308, 313 (Minn.1980); *State v. Merrill*, 274 N.W.2d 99, 111 (Minn.1978).

Appellant challenges the jury's verdict, arguing that J.B.'s delay in telling her mother about the assault brings J.B.'s credibility into question. He also suggests that J.B. and Mathewson fabricated the entire story, because they were sexually intimate and feared that J.B. might be pregnant. Finally, he argues that the state's corroborating evidence was more consistent with his version of the incident than with J.B.'s version.

■ Appellant's first assertion disregards the predicament J.B. faced when accusing her own brother of sexual assault.

J.B. testified that she feared her mother's reaction. Her reluctance to tell her mother was reasonable under the circumstances and does not lessen her credibility as a witness. Moreover, with even less delay J.B. reported to Mathewson, the person closest to her who was not a family member.

■ Appellant's other contentions raise the question of corroborative evidence. The victim's testimony need not be corroborated in all sex crime cases. *State v. Ani*, 257 N.W.2d 699, 700 (Minn.1977). In some cases, however, the testimony of the complainant and the evidence put forth by the defense may necessitate reversal absent corroboration. *Id.; State v. Buckhalton*, 296 N.W.2d 881, 883 (Minn.1980).

■ This is not such a case. The victim's testimony was positive and it was uncontradicted. There was no evidence of any motive on J.B.'s part to fabricate a damaging story about her brother. Moreover, the testimony did not contain any inconsistencies indicative of fabrication. J.B. was taking birth control pills, so she had little fear of pregnancy. The jury was in the best position to evaluate her demeanor on the witness stand and chose to believe her testimony, which was sufficient to support a guilty verdict. We will not disturb the jury's assessment of the evidence.

■ Even if we were to require corroboration here, we conclude that J.B.'s testimony was corroborated by other evidence. The testimony of J.B.'s mother and of Mathewson detailed the same time frame and sequence of events as recounted by J.B. They also described J.B.'s disturbed emotional state, as did the doctor who examined her at the hospital and the police officer who took her statement several days later.

The physical evidence also corroborates J.B.'s testimony. The medical expert testified that sexual intercourse had occurred within a few hours of the post-assault examination. No one was positively identified as the source of the semen found on J.B. and on her clothing, but the time

frame conclusively shown by the test results corresponded with J.B.'s report of facts.

## DECISION

The uncontradicted testimony and physical evidence reasonably supports a verdict of guilty.

Affirmed.