**STATE of Minnesota, Respondent,**

v.

**Victor Daniel MESICH, Appellant.**

**No. C7–86–252.**

Court of Appeals of Minnesota.

Nov. 10, 1986.

Review Denied Jan. 2, 1987.

Hubert H. Humphrey III, Atty. Gen., Janet A. Newberg, Sp. Asst. Atty. Gen., St. Paul, Roger S. VanHeel, Stearns Co. Atty., St. Cloud, for respondent.

C. Paul Jones, State Public Defender, Ann Remington, Asst. State Public Defender, Minneapolis, for appellant.

Heard, considered, and decided by the court, en banc, consisting of POPOVICH, C.J., and PARKER, FOLEY, WOZNIAK, SEDGWICK, LANSING, HUSPENI, FORSBERG, LESLIE, NIERENGARTEN, RANDALL, and CRIPPEN, JJ.

## OPINION

WOZNIAK, Judge.

Victor Daniel Mesich was found guilty by a Stearns County jury of criminal sexual conduct in the first degree, in violation of Minn.Stat. § 609.342(d) (1984). He was sentenced to five and one-half times the presumptive sentence. He appeals from the judgment of conviction and the sentence. We affirm the conviction and the sentence.

## FACTS

On November 2, 1982, at approximately 10:15 p.m., the victim, an 18–year-old freshman at St. Cloud State University, left her on-campus dorm room to walk to a local grocery store. As she took a shortcut through a church parking lot, a man stepped out from behind her, grabbed her around the neck with his left arm, and pushed a sharp object into her lower back. The man pointed to a corner of the parking lot, told the victim to walk in that direction, and, holding her tight against his chest, forced her forward. The victim observed a large, dark-colored, four-door car in the corner of the lot. The man forced her into the rear passenger door. As the assailant

opened the door, the victim noticed a knife with a six-inch blade in his hand.

When the assailant shoved the victim into the car, she landed on her left side on the back seat and then rolled over onto her back. He climbed in on top of her, putting his left knee on the seat beside her, and his right knee on the floor. He shut the car door and put the knife on the hump on the floor.

The assailant roughly pulled down the zipper on the victim's jacket, pulled the jacket off, and threw it on the floor. He pushed her sweatshirt up underneath her arms, exposing her breasts. When he saw that she was not wearing a bra, he began taunting her, asking her if she was trying to "flaunt," and if she "thought she was so great" because she had breasts. He began to roughly pinch and twist the victim's breasts, causing a great deal of pain. He then picked up the knife and pushed it under the victim's right breast. He threatened to cut her breasts off, saying that she did not deserve to have them and that they should be thrown in the garbage. The victim believed that he was really going to cut her breasts off. She could see his face during this time, and testified that he looked very amused by how frightened she was, and at the same time he looked very angry.

The assailant then placed the knife on the shelf under the rear window. He unzipped his pants and forced the victim to massage his penis for several minutes. He removed the victim's pants, underpants and shoes, and roughly inserted his finger in her vagina, causing pain. She closed her legs and tried to pull away, whereupon the rapist became extremely angry and punched her hard in the stomach several times. He jabbed her in the stomach with the knife several times, causing several wounds and leaving one permanent scar. He pushed her legs apart, inserted the tip of the knife inside her vagina, and said he should cut those parts out of her, that she did not deserve to have them, that he should just throw them away. At this

point, the victim believed the rapist was going to kill her.

The rapist then grabbed the back of the victim's head and forced his penis into her mouth. She gagged and thought she was going to be sick. As he forced her to perform fellatio, he said "You must know what you're doing. You must enjoy this, too."

The rapist then roughly forced intercourse upon the victim, hurting her badly. He raped her for a long period of time, then pulled out and masturbated himself, ejaculating onto her chest.

After ejaculating, the rapist got angry, hit the victim again, and told her that she was not any good, that rape was the only thing she was made for, that it would have been better with a dog, and that he should not have wasted his time on a piece of trash.

Finally, the rapist zipped up his pants, threw the victim's clothes at her, and told her to get out of the car. She got out as he started the engine, and he drove away immediately. The victim got dressed in the corner of the parking lot and walked back to her dormitory. Her roommate was not home that night. The victim showered immediately and cried for the rest of the night.

The victim did not immediately report the rape to the authorities. The first time she told another person about it was about two weeks later, on November 17, 1982, when she told her therapist. The therapist urged the victim to report the rape, but the victim was very frightened that if she reported it, the rapist would come after her, because he had threatened her. The victim was very reluctant to talk about it even to her therapist, and did not describe the rape in any detail.

On February 23, 1983, the victim met with her therapist and was very anxious. She told her therapist that she had recently seen the rapist for the first time since the rape at the Crossroads Shopping Mall in St. Cloud.

In March of 1983, the victim began to open up more with her therapist about the rape and discuss the details of the rape with her. As the anniversary of the rape approached in November of 1983, the victim was still feeling an extreme amount of anxiety. She told her therapist that she was feeling a lot of shame about the rape, blaming herself, and talked about not wanting to be a woman any more, about having an operation to have her female organs removed. The therapist testified that the victim had been angry and distrustful of men prior to the rape, but these problems escalated greatly afterwards. At some point several months after the rape, the victim was admitted to the psychiatric ward of a St. Cloud hospital because of depression and suicidal thoughts.

The victim testified that in the summer of 1984 she began to see her assailant walking around the Crossroads Mall area on a regular basis. She saw him with other people a lot, and on one occasion she saw him in the company of Joan West, a woman the victim knew from a local women's shelter.

Towards the end of 1984, the victim began to feel guilty about not reporting the rape. She testified that every time she heard that a rape had been committed in the St. Cloud area, she wondered if her attacker had done it. She decided to report the rape to the police.

On January 15, 1985, the victim reported the rape to Officer Kathy Nolan of the St. Cloud Police Department. She described the rapist to Nolan as a white man, approximately 6′ 5″ and slender. Nolan showed the victim a photographic lineup of five men matching this general description. According to Nolan's testimony, the victim immediately pointed to the photograph of defendant as the man who raped her. The photograph of defendant was from a state identification card issued to persons who do not qualify for a driver's license.

Defendant was arrested and charged with first-degree criminal sexual conduct. Robert Diedrichs, Chief of Detectives for the St. Cloud Police Department, interviewed defendant about the attack. The interview was taped. Defendant admitted he knew Joan West, and indicated that he had lived with her for some time. He denied being in St. Cloud in 1982. He stated that he had never had a driver's license. He stated during the taped interview that he was going to plead guilty, do his 20 years, and then file suit for false arrest.

Later that same morning, Detective Diedrichs completed the booking procedure with defendant. Diedrichs testified that as he was fingerprinting defendant, defendant stated, "I did it." Diedrichs asked "Why?" Defendant replied, "Because she didn't deserve to live." The interview was over at this point and defendant's statements were not tape-recorded. At trial, defendant admitted that, while being fingerprinted, he had told Diedrichs that he did it. He testified that he said it out of "rage and madness" at being taken to jail. He then testified that he told Diedrichs "I might as well plead guilty to it and say I did it." He denied telling Diedrichs that he did it because the victim did not deserve to live.

Minneapolis police officer David Berekeley testified at defendant's trial that on June 10, 1983, he searched defendant and retrieved from defendant's sock a fillet knife with an overall length of ten inches, including the handle. At that time, defendant's residence address was 829 Hennepin Avenue, Minneapolis, above the You All Come Back Saloon.

Defendant testified at trial that he had not been in St. Cloud in either November 1982 or February 1983 and that he had been living at the Tourist Hotel, 829 Hennepin Avenue, Minneapolis, in the fall of 1982. He testified that he moved to St. Cloud in August 1984 and that he had frequented both downtown St. Cloud and the Crossroads shopping mall in 1984. He admitted that he knew Joan West and that he had a knife in his boot when he was searched by Officer Berekeley in 1983. He denied that he had ever seen the victim before trial.

Defendant had only two crooked front teeth at the time of trial, having lost the rest of them to gum disease twelve to fifteen years earlier. He testified that he did not have a driver's license, did not drive or own a car, and did not even know how to start a car.

Defendant's mother and his current wife both testified in his behalf. His mother recalled that in the fall of 1982, defendant's first wife had a breast removed due to cancer. She testified that defendant and his wife were divorced in 1982. She testified that, to the best of her knowledge, defendant had never had a driver's license, and she had never observed him driving a car. She testified that she believed defendant was living in Minneapolis at two or three different addresses in 1982 and 1983, but she did not know the exact addresses. She admitted that sometimes months would go by when she did not see the defendant, and she was not sure if he was currently married.

Defendant's current wife testified that she had never observed defendant drive an automobile and that to the best of her knowledge he did not have a driver's license. She admitted, however, that she had met the defendant for the first time within one month of the date they were married, January 9, 1985. The rape thus occurred over two years before they first met.

The jury found defendant guilty as charged. The trial court sentenced defendant to a term of 240 months imprisonment, a five and one-half times upward departure from the presumptive guidelines sentence of 43 months.

## ISSUES

1. Was the evidence insufficient as a matter of law to sustain defendant's conviction?

2. Did the trial court abuse its discretion in imposing a five and one-half times upward departure from the presumptive sentence?

## ANALYSIS

1. In *State v. Merrill*, 274 N.W.2d 99 (Minn.1978), the supreme court set forth the basic principles to be followed in evaluating the sufficiency of the evidence:

> In reviewing a claim of insufficiency of the evidence, we are limited to ascertaining whether, given the facts in the record and the legitimate inferences that can be drawn from those facts, a jury could reasonably conclude that the defendant was guilty of the offense charged. *We cannot retry the facts, but must take the view of the evidence most favorable to the state and must assume that the jury believed the state's witnesses and disbelieved any contradictory evidence.* If the jury, giving due regard to the presumption of innocence and to the state's burden of proving the defendant's guilt beyond a reasonable doubt, could reasonably have found the defendant guilty, that verdict will not be reversed.

*Id.* at 111 (citations omitted) (emphasis added).

Defendant does not dispute that the victim was brutally raped on November 2, 1982. He argues, however, that insufficient evidence was presented at trial to prove beyond a reasonable doubt that he was the rapist.

■ The State must prove identity beyond a reasonable doubt. *State v. Armstrong*, 311 Minn. 541, 249 N.W.2d 176, 178 (1976). In *State v. Burch*, 284 Minn. 300, 170 N.W.2d 543 (1969), the supreme court listed the five factors to be considered in evaluating identification testimony:

> The factors involved would include the opportunity of the witness to see the defendant at the time the crime was committed, the length of time the person committing the crime was in the witness' view, the stress the witness was under at the time, the lapse of time between the crime and the identification, and the effect of the procedures followed by the police as either testing the identification or simply reinforcing the witness' initial determination that the defendant is the one who committed the crime.

*Id.* at 315–16, 170 N.W.2d at 553–54. Consideration of these five factors leads to the conclusion that the victim's identification testimony was reliable.

First, the victim had ample opportunity to see the rapist at the time the crime was committed. Through almost all of the attack, the victim was lying on her back, face-to-face with the assailant, looking at his face. At trial, she testified as to the expression on his face. Although the attack took place at night, the area was lit by a street light just across from where the attack occurred.

Defendant argues that if he were the rapist and if there really had been sufficient light for the victim to view him during the attack, she surely would have noticed that he had only two front teeth, a fact she did not report when she initially described her attacker to the police. However, the record does not indicate whether defendant's toothlessness is apparent when he speaks or opens his mouth. In addition, the only evidence that defendant's teeth were in that condition on the date of the attack is his own testimony and his mother's.

The second factor listed by the *Burch* court, the length of time the defendant was in the witness's view, weighs in favor of reliability in this case. The victim's testimony indicates that her attacker was in her view for almost the full duration of the attack.

The third factor listed by the *Burch* court to be considered in evaluating eyewitness testimony is the stress the witness was under at the time of the crime. Here, the victim's testimony regarding the attack was sufficiently detailed to indicate that her fear did not prevent her from observing details at the time of the attack. There is no indication that the stress the victim suffered affected the accuracy of her identification testimony.

The fourth *Burch* factor, the lapse of time between the crime and the identification, is more troublesome in this case because the victim did not pick defendant out of a photographic lineup until February 1, 1985, 27 months after the attack. The victim first reported the rape on November 17, 1982, however, two weeks after it occurred. She first reported seeing her assailant at the Crossroads Mall on February 23, 1983, three and one-half months after the attack. She saw him at the mall and in downtown St. Cloud several times during the summer of 1984.

The fifth *Burch* factor, the effect of police procedures on the identification, is not at issue in this appeal. There is no allegation that the photographic lineup was suggestive.

Defendant also argues that the victim's identification of her assailant was not reliable because her initial description of the assailant was not sufficiently detailed. The victim described her attacker to Officer Nolan as a white male, approximately 6′ 5″, 170 pounds, slender build, dark brown or black hair, approximately 30 to 35 years old, and having a ruddy complexion as if he had been out in the sun quite a bit. Officer Nolan testified that the description of defendant on his state-issued identification card was substantially similar to that given by the victim.

In addition to the victim's identification testimony, additional evidence was introduced here which corroborated that defendant was the assailant. First, defendant admitted that he used to spend time hanging around the Crossroads Mall in St. Cloud, and that he knew Joan West.

Second, and much more important, however, is the evidence that defendant confessed to a police officer. Detective Diedrichs testified that, while being fingerprinted following his arrest, defendant spontaneously said "I did it" and when asked why, responded, "Because she didn't deserve to live." At trial, defendant admitted that he said he did it, although he testified that he made this statement only out of anger at the police, and denied saying that the victim did not deserve to live. In reviewing a claim of insufficient evidence, however, this court must take the view of the evidence most favorable to the State,

and must assume that the jury believed the State's witnesses and disbelieved any contrary evidence. *State v. Merrill*, 274 N.W.2d at 111.

In summary, the victim's identification testimony alone was probably sufficiently reliable that a reasonable jury could have found defendant guilty. Even if the identification testimony alone were not sufficient, the corroborating evidence, particularly defendant's spontaneous confession, when viewed in conjunction with the identification testimony, provided sufficient evidence to support the jury's verdict of guilty.

2. Defendant was convicted of criminal sexual conduct in the first degree in violation of Minn.Stat. § 609.342(d) (1984). The presumptive sentence for this severity level 8 offense for an offender with a criminal history score of zero is 43 months. The trial court sentenced defendant to the statutory maximum of 240 months, a five and one-half times upward durational departure. The trial court stated the following reasons for departure:

1. The victim was treated with outrageously gross and vile physical and verbal cruelty.

2. The defendant forced the victim to engage in six different acts of sexual abuse, including various types of penetration.

3. The defendant's acts caused the victim to be significantly traumatized psychologically, and his actions were each consistent with a course of conduct intended to humiliate, degrade, and physically harm her.

Defendant concedes that his conduct would justify a double durational departure, but argues that his conduct was not so egregious as to justify a greater departure.

Generally, in a case in which an upward durational departure is justified, the upper limit will be double the presumptive sentence. A greater than double departure will be upheld only in "rare cases" in which the facts are "unusually compelling." *State v. Evans*, 311 N.W.2d 481, 483 (Minn. 1981). Multiple penetrations alone will generally justify a double, but not greater, upward durational departure. *See, e.g., State v. Heinkel*, 322 N.W.2d 322 (Minn. 1982); *State v. Martinez*, 319 N.W.2d 699 (Minn.1982).

The Minnesota Supreme Court upheld a 240–month sentence for first-degree criminal sexual conduct in *State v. Herberg*, 324 N.W.2d 346 (Minn.1982). The defendant's conduct in *Herberg* was similar in many respects to the defendant's conduct here.[1] In *Herberg*, the defendant forced a 14–year-old girl into his car and drove her to an isolated area where he subjected her to various forms of sexual abuse and physical degradation. As in this case, the defendant in *Herberg* subjected his victim to multiple penetrations. The defendant in *Herberg* also cut his victim's vagina with a knife. Here, the defendant inserted a knife in the victim's vagina and threatened to cut out internal organs. In *Herberg*, the defendant forced his victim to stick a safety pin into one of her nipples and forced her to burn herself with a cigarette. Here, the defendant punched and stabbed the victim repeatedly in the stomach after she attempted to stop the attack, causing a permanent scar. In *Herberg*, the defendant choked his victim to the point of unconsciousness. Here, the defendant forced his penis into the victim's mouth until she gagged.

Finally, in *Herberg*, the defendant forced his victim to ingest excrement and urine. While the defendant here did not subject the victim to this form of degradation, he nonetheless subjected her to vicious psychological degradation. Defendant pushed a knife under the victim's breast, cutting her, and threatened to cut her breasts off and throw them away because she "didn't deserve to have them." Later, he stuck his knife into her vagina and told her that he

---

1. We recognize that, beyond a certain point, comparative analysis of depraved behavior becomes an exercise in futility.

was going to cut out her female organs and throw them away because she did not deserve to have them. Finally, when the attack was over, defendant told his victim that she was no good, that this kind of abuse was the only thing she was made for, that it would have been better with a dog, and that he should not have wasted his time on a piece of trash.

Of course, any forcible rape at knifepoint will inflict emotional and psychological injuries. Here, however, the defendant's vicious taunts, threats, and his cruel degradation of the victim constituted a form of emotional abuse which sets this case apart from a more "typical" rape. The victim was seriously traumatized by the rape. At the time the rape occurred, she was seeing a therapist because of emotional troubles. As a result of the defendant's attack on her, she had to be hospitalized for depression and suicidal thoughts.

In *Herberg*, the supreme court held that the 240–month sentence was justified because the defendant "subjected the victim to outrageously gross and vile physical abuse." 324 N.W.2d at 350. Here, the defendant subjected the victim to extreme psychological and emotional abuse, as well as physical. We agree with the trial court that this is one of those "rare cases" where the facts justify imposing a sentence greater than that allowed by the general doubling rule of *State v. Evans*, 311 N.W.2d 481, 483 (Minn.1981).

After careful consideration, we have concluded that defendant's depraved and barbarous savagery to his victim justifies imposition of the maximum sentence permissible under the statute. The trial court did not abuse its discretion in sentencing defendant as it did.

### DECISION

We affirm the conviction and the sentence imposed by the trial court.

Affirmed.

RANDALL, Judge, concurring specially.

I cannot disagree that the facts enunciated by the majority justify the 240 month sentence imposed by the trial court. However, I cannot place the same reliance on *State v. Herberg*, 324 N.W.2d 346 (Minn. 1982), that the majority opinion does. Both the *Herberg* trial court and the trial court here imposed the statutory maximum sentence of 240 months. To that extent, the two upward departure decisions are parallel. However, the *Herberg* court sentence was 3.7 times the presumptive sentence. Here the trial court had to multiply the presumptive sentence by 5.5 to get to the maximum. Although *Herberg* does not tell us that we cannot multiply a presumptive sentence by a factor of 5.5 times, it does not tell us that we can. The issue in *Herberg* was how bad do the facts have to be to warrant upward departure to the statutory maximum, not how many times can you multiply the presumptive sentence to get there.[1]

Although I cannot find a case where this issue has been precisely decided, I believe the spirit and intent of the Minnesota Sentencing Guidelines is that upward departure of five, six, eight, or ten times the presumptive sentence is qualitatively different and constitutes a harsher sentence than doubling or tripling the presumptive sentence, even though the end result in terms of number of months is the same.

To illustrate, assume that a defendant commits a crime which carries a maximum penalty of 20 years or 240 months. Assume that because of a high criminal history score the presumptive sentence for this defendant is 120 months (example one). Then, to reach the maximum possible sentence, the trial court need only multiply the presumptive sentence by a factor of two.

Now assume that a defendant commits, in an equally heinous manner, a crime calling for a maximum possible sentence of 240 months, but because of a zero history

1. The presumptive sentence in *Herberg* was 65 months (60–70) whereas the presumptive sentence in this case is 43 months.

score only has a presumptive sentence of approximately 40 months executed (example two). Even though the heinousness and viciousness and substantial and compelling circumstances of both defendant's actions are the same, the trial judge in the second example has to multiply the presumptive sentence by a factor of six to get up to 240 months. Is example one controlling precedent for example two? I do not think so. The sentence for defendant in example two is harsher than the sentence in example one, although the length is the same.

We do have clear direction in *State v. Evans*, 311 N.W.2d 481 (Minn.1981). *Evans* held that upward durational departures should generally be limited to double the presumptive sentence and, absent "unusual compelling" facts, a departure of more than double cannot be justified. *See Evans* 311 N.W.2d at 483.

*Herberg* tells us that there do exist cases with extremely aggravating factors that allow for imposing sentences above and beyond the general doubling rule. *Herberg*, however, while acknowledging that the maximum sentence authorized by law is the cap in terms of years, did not address whether or not there is a cap on the multiplying factor.

There appears to be a need for a cap on the multiplying factor. If the only limit on upward departures is the maximum allowed by statute, there will be a trend toward departures of five, six, eight, ten, etc. times the presumptive sentence in order to reach the maximum when the facts are aggravated. This trend would emasculate the clear intent of the legislature when establishing the guidelines that the presumptive sentence had built into it due consideration for heinous elements of crime.

[T]he legislature, to a great extent, has taken the vulnerability of the victims of rape and factors such as the use of knives and threats into account in distinguishing rape offenses by degree. However, we have also indicated that each case must be considered on its own. *Herberg*, 324 N.W.2d at 349.

I am concerned about a trend to treat the presumptive sentence as intended only for "nice" people who commit "nice" felonies. Whenever the defendant is the least bit odd or different and the facts the least bit aggravated or bizarre, there appears to arise a "presumption" that an upward departure is the norm, and that imposition of the presumptive sentence is somehow a sign of leniency. That is decidedly not the case. There is never a "presumption" that the presumptive sentence is not sufficient to punish the defendant. The power of trial courts to depart upward to double the presumptive sentence and then use unusual and compelling circumstances to go even higher is always a "departure". Even in the face of aggravated acts, upward departures must be scrutinized to overcome the legislative presumption.

There would be no sense or good taste in discussing the underlying facts in *Herberg* and in this case to attempt to quantify which defendant was the bigger villain and which victim suffered the most harm and most degradation. Both defendants committed extremely bad acts, and both victims suffered extreme injury. What needs to be addressed is whether a multiplier cap is needed.

We already acknowledge the necessity of maximum caps regardless of the heinousness of the crime, as all crimes, except murder in the first degree, have a statutory maximum in terms of years.

To assist trial courts, prosecutors, and the criminal defense bar, I invite direction from our supreme court and the legislature. Applying the Minnesota Sentencing Guidelines and interpreting *Evans* and *Herberg*, I would hold that if there exist unusual and compelling circumstances so aggravated that more than double the presumptive sentence can be justified, then in no case can the sentence imposed exceed a factor of, for instance, 3.5 times the presumptive.

Since presumptive sentences are higher for each criminal history point, this standard would recognize the importance the guidelines place on sentencing people differently for committing the same crime if they have a higher criminal history score. At the present time, the only sentencing cap in Minnesota is the statutory maximum. The number of times a trial court can multiply the presumptive is the issue, not whether or not the statutory maximum can be reached. This issue should be addressed.

LESLIE, Judge (dissenting).

I respectfully dissent. I share the view of the majority that this is a case that justifies a departure from the guidelines. I am also satisfied that the egregious facts of this case makes this that rare case justifying more than a double departure. It is important, however, that some limit be established above which a trial court cannot go. I would establish a triple departure as an absolute limit which this court would approve until expressly authorized to the contrary by the supreme court, the Sentencing Guidelines Commission or the legislature. Otherwise, disparity will be the order of the day, the guidelines will become meaningless, and we can return to indeterminate sentencing.

NIERENGARTEN, Judge (dissenting).

I join in the dissent of Judge Leslie.

CRIPPEN, Judge (dissenting).

I join in the dissent of Judge Leslie.

LANSING, Judge (dissenting).

I join Judge Leslie's dissent, except his request for imposition of an absolute departure limit.

FORSBERG, Judge (dissenting).

I join in the dissent of Judge Leslie. What is particularly bothersome in these "extraordinary" departures is the "trivializing" of the criminal history points.